DONALDSON v. CITY OF EL RENO
2025 OK 9
Case Number: 120617
Decided: 02/04/2025
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2025 OK 9, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

KELLY PATRICK DONALDSON, Plaintiff/Appellee,
v.
CITY OF EL RENO, a political subdivision of the State of Oklahoma, Defendant/Appellant,
and
STATE OF OKLAHOMA, Intervening Appellant.

ON APPEAL FROM THE DISTRICT COURT OF CANADIAN COUNTY,
STATE OF OKLAHOMA
HONORABLE JACK D. McCURDY II, DISTRICT JUDGE

¶0 When Plaintiff/Appellee Kelly Patrick Donaldson was convicted of second degree rape and became subject to the Sex Offenders Registration Act (SORA) in 2005, SORA did not prohibit sex offenders from residing near parks. The Oklahoma Legislature subsequently amended 57 O.S., § 59057 O.S.Supp.2019, § 590

ORDER OF DISTRICT COURT IS REVERSED
AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.

Alan M. Taylor, William Blocker, Keenan P. Haught, Palmer Law, Ada, Oklahoma, for Plaintiff/Appellee.

Jana L. Knott, W. Jason Hartwig, Bass Law, P.C., Oklahoma City, Oklahoma, for Defendant/Appellant.

Zach West, William Flanagan, Office of the Attorney General of the State of Oklahoma, for Intervenor State of Oklahoma.

Daniel McClure, Christian Rinehart, Oklahoma City, Oklahoma, for amicus curiae The Oklahoma Municipal League.

KANE, J.:

¶1 Title 57, § 590 of the Sex Offenders Registration Act (SORA) prohibits sex offenders from residing within a 2,000-foot radius of a city park and certain other locations. The issue presented is whether applying the current residency restrictions to a sex offender who became subject to SORA prior to the enactment or amendment of the law violates the ex post facto clause of either the United States Constitution or the Oklahoma Constitution. We hold it does not. The current residency restrictions in 57 O.S.Supp.2019, § 590

FACTS AND PROCEDURAL HISTORY

¶2 Plaintiff/Appellee Kelly Patrick Donaldson was charged with first degree rape, in violation of 21 O.S.2001, § 111421 O.S.2001, § 1114

¶3 Donaldson was initially released from prison and began registering as a sex offender in December 2007. He was arrested again on June 15, 2009 and charged with plotting to murder his probation officer in CF-2009-329, in Bryan County District Court. In September 2012, Donaldson pled no contest and was sentenced to ten years in prison to run concurrently with the sentence on the rape conviction. The District Court of Woodward County revoked Donaldson's suspended sentence on the rape conviction on December 12, 2012. Donaldson was released from prison on or around December 31, 2015, at which time he registered as a sex offender and moved into an apartment in Oklahoma City.

¶4 On December 17, 2021, Donaldson inquired with the El Reno Police Department whether he could live at a residence in El Reno, Oklahoma. The El Reno Police Department advised him that he could not reside on the property, because 57 O.S.Supp.2019, § 590

¶5 Despite the El Reno Police Department's admonition, Donaldson purchased the property. He then filed the underlying action against the City seeking a declaratory judgment that applying the 2019 version of the residency restrictions to him violated the ex post facto clauses in Article 1, § 10 of the United States Constitution and Article 2, § 15 of the Oklahoma Constitution.

¶6 The parties filed competing motions for summary judgment. Donaldson argued that the law in effect on the date of his conviction applied, and, on April 20, 2005, SORA did not prohibit registered sex offenders from residing within 2,000 feet of a park. See 57 O.S.Supp.2004, § 59057 O.S.Supp.2006, § 590Starkey v. Oklahoma Department of Corrections, 2013 OK 43305 P.3d 1004Starkey did not decide the constitutionality of the residency restrictions. City contended that the residency restrictions were nonpunitive, civil regulations, and, therefore, applying the current law to persons who became subject to SORA before the effective date of the amendments did not violate the ex post facto clause of either the federal or state Constitution.

¶7 Donaldson further argued that, even if the court found the current residency restrictions applied to him, Lake El Reno is not a "park" for purposes of 57 O.S.Supp.2019, § 59057 O.S.Supp.2019, § 590

¶8 The trial court granted summary judgment to Donaldson. The trial court concluded the residency restrictions were so punitive in nature that applying the 2019 version of 57 O.S., § 590Starkey and Graham v. Carrington Place Property Owners Ass'n, 2019 OK CIV APP 33456 P.3d 1137

¶9 City appeals. This Court granted Donaldson's motion to retain the appeal and ordered additional briefing. The Oklahoma Attorney General intervened in the appeal, and the Oklahoma Municipal League was permitted to file a brief as amicus curiae. Oral arguments were heard by the Court en banc on November 30, 2023.

STANDARD OF REVIEW

¶10 The constitutionality, construction, and application of a statute are questions of law to be reviewed de novo. See Lee v. Bueno, 2016 OK 97381 P.3d 736de novo review, "this Court possesses plenary, independent, and non-deferential authority to examine the issues presented." Id. ¶ 6, 381 P.3d at 740. When determining the constitutionality of a statute, "courts are guided by well-established principles, and a heavy burden is cast on those challenging a legislative enactment to show its unconstitutionality." Id. ¶ 7, 381 P.3d at 740. Legislative enactments are presumed to be constitutional. Jacobs Ranch, L.L.C. v. Smith, 2006 OK 34148 P.3d 842See Lafalier v. Lead-Impacted Cmtys. Relocation Assistance Trust, 2010 OK 48237 P.3d 181

ANALYSIS

I. Ex Post Facto Laws

¶11 Article I, § 10 of the United States Constitution provides, in pertinent part: "No State shall . . . pass any Bill of Attainder, ex post facto Law . . . ."

¶12 The prohibitions on ex post facto laws bar the enactment of any law which (1) retroactively imposes punishment for an act that was not punishable when committed; (2) retroactively increases the punishment for a crime after its commission; or (3) deprives one charged with a crime of a defense that was available at the time the crime was committed. See Collins v. Youngblood, 497 U.S. 37, 42 (1990) (citing Beazell v. Ohio, 269 U.S. 167, 169-70 (1925)); Starkey, 2013 OK 43Collins and Beazell). "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." Collins, 497 U.S. at 43.

II. The Legislature Intended for the Residency Restrictions to Apply 
Retroactively

¶13 The Oklahoma Legislature first adopted residency restrictions for sex offenders in 2003. The first rendition prohibited registered sex offenders from residing within a 2,000-foot radius of a public or private school or educational institution. See 2003 Okla. Sess. Laws, ch. 223, § 1 (eff. Nov. 1, 2003) (codified as 57 O.S.Supp.2003, § 59057 O.S.Supp.2004, § 590

It is unlawful for any person registered pursuant to the Sex Offenders Registration Act to reside, either temporarily or permanently, within a two-thousand-foot radius of any public or private school site, educational institution, property or campsite used by an organization whose primary purpose is working with children, a playground or park that is established, operated or supported in whole or in part by a homeowners' association or a city, town, county, state, federal or tribal government, a licensed child care center or family child care home as defined in the Oklahoma Child Care Facilities Licensing Act or the residence of his or her victim. Establishment of a licensed child care center, family child care home or park in the vicinity of the residence of a registered sex offender will not require the relocation of the sex offender or the sale of the property. On June 7, 2006, the distance indicated in this section shall be measured from the nearest property line of the residence of the person to the nearest property line of the public or private school site, educational institution, property or campsite used by an organization whose primary purpose is working with children, playground, park, licensed child care center, family child care home or residence of his or her victim; provided, any nonprofit organization established and housing sex offenders prior to the effective date of this provision shall be allowed to continue its operation.

Nothing in this provision shall require any person to sell or otherwise dispose of any real estate or home acquired or owned prior to the conviction of the person as a sex offender.

57 O.S.Supp.2019, § 590

¶14 The issue is whether the current version of 57 O.S., § 590

¶15 Amendments to the law are generally presumed to operate prospectively unless the Legislature's intent to give it retrospective effect is expressly declared or it is necessarily implied from the language in the statute. See Dolese Bros. Co. v. State ex rel. Okla. Tax Comm'n, 2003 OK 464 P.3d 1093Wickham v. Gulf Oil Corp., 1981 OK 8623 P.2d 613Good v. Keel, 1911 OK 264116 P. 777Dolese, 2003 OK 4see Good, 1911 OK 264116 P. at 777

¶16 We find the Legislature intended for the residency restrictions, as amended, to apply retroactively to sex offenders who were already required to register prior to the effective date of the amendment.any person registered pursuant to the Sex Offenders Registration Act to reside . . . ." 57 O.S.Supp.2019, § 590

¶17 The pertinent question then becomes: are the residency restrictions punitive? If the residency restrictions are punitive, the amendment cannot be applied retroactively, because the ex post facto clause prohibits retroactively imposing or increasing punishment for a crime. But if the residency restrictions are not punitive, the ex post facto clause is not implicated, and it is within the Legislature's discretion to give the provisions retroactive effect.

III. Intent-Effects Test

¶18 In the seminal case Smith v. Doe, 538 U.S. 84 (2003), the United States Supreme Court set forth what has become known as the "intent-effects" test for determining whether the retroactive application of sex offender registration laws violates the ex post facto clause of the United States Constitution. We adopted this test in Starkey v. Oklahoma Department of Corrections, 2013 OK 43305 P.3d 1004

¶19 The ex post facto clause applies only to criminal or penal laws. Therefore, the initial inquiry is whether the legislature intended for the provision to be civil or criminal. Smith, 538 U.S. at 92-93; Starkey, 2013 OK 43Id. But, if the legislature intended for the provision to be part of a civil, non-punitive regulatory scheme, we apply the intent-effects test to determine whether the civil, regulatory provision is so punitive, either in purpose or effect, as to negate that intent. See Smith, 538 U.S. at 92 (citing Kansas v. Hendricks, 521 U.S. 346, 361 (1997)); Starkey, 2013 OK 43Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963):

(1) whether the law imposes an affirmative disability or restraint;

(2) whether it has been historically regarded as a punishment;

(3) whether its operation promotes the traditional aims of punishment--retribution and deterrence;

(4) whether it has a rational connection to a non-punitive purpose; and

(5) whether it is excessive in relation to this purpose.

Smith, 538 U.S. at 97; Starkey, 2013 OK 43Mendoza-Martinez:

(6) whether it is incumbent only on a finding of scienter; and

(7) whether the behavior to which it applies is already a crime.

Starkey, 2013 OK 43Smith, 538 U.S. at 97 (quoting United States v. Ward, 448 U.S. 242, 249 (1980)); see Starkey, 2013 OK 43Mendoza-Martinez factors, the United States Supreme Court has said: "Because we ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override that intent and transform what has been denominated a civil remedy into a criminal penalty." Smith, 538 U.S. at 92 (internal quotations and citations omitted); see Starkey, 2013 OK 43

IV. Starkey v. Oklahoma Department of Corrections

¶20 We agree with City that Starkey is not dispositive of the issue presented in this case. Mr. Starkey pled nolo contendere to sexual assault of a minor child and received a deferred judgment in Texas in 1998. See Starkey, 2013 OK 43Starkey, 2013 OK 43See 57 O.S.Supp.2007 & Supp.2008 §§ 582.1-582.5; Starkey, 2013 OK 43See Starkey, 2013 OK 4357 O.S.Supp.2008, § 583Starkey was whether applying these amendments, which had the effect of extending Starkey's registration period from ten years to life, retroactively increased his punishment.

¶21 In Starkey, we adopted Smith's analytical framework for evaluating ex post facto challenges under the Oklahoma Constitution. See Starkey, 2013 OK 43Smith.Starkey Court determined that the cumulative effects of SORA's requirements and restrictions were punitive and outweighed SORA's nonpunitive purpose. Id. ¶ 77, at 1030. Therefore, applying amendments that extended a sex offender's registration period retroactively increased the sanctions imposed in violation of the ex post facto clause of the Oklahoma Constitution. Id. ¶¶ 78-79, at 1030. In the simplest terms, Starkey says the State can't keep moving the finish line.

¶22 The issue presented in Starkey is not presented in this appeal. Donaldson admits that at the time of his conviction, the law provided he was to be designated as an aggravated sex offender and that he is required to register for life. Donaldson does not contend that subsequent amendments to the residency restrictions in 57 O.S., § 59057 O.S., § 590

¶23 We did not determine, in Starkey, that the residency restrictions in 57 O.S.Supp.2012, § 590Starkey Court emphasized that "[o]ur scope is focused on the constitutionality of retroactively extending SORA registration. . . . Having found SORA's effects to be punitive, we find the retroactive extension of its registration period violates the prohibition on ex post facto laws provided in Article 2, § 15 of the Oklahoma Constitution." Starkey, 2013 OK 4357 O.S., § 590Mendoza-Martinez factors--affirmative disability or restraint,See Starkey, 2013 OK 43Mendoza-Martinez factor and the punitive effect of the act in its totality."); id. ¶ 61, 305 P.3d at 1026 ("Again, we are not making a determination of the constitutionality of any of these individual registration requirements but for purposes of analyzing the second Mendoza-Martinez factor we find the totality of these requirements weigh in favor of punishment."); see also Fry v. State ex rel. Dep't of Corr., 2017 OK 77404 P.3d 38

¶24 We reject Donaldson's argument and the trial court's conclusion that Starkey says--for every provision of SORA--the version in effect on the date of his conviction applies. This conclusion is beyond the scope of Starkey and its progeny. The so-called "date of conviction" rule was born out of Starkey. The Starkey Court concluded that, because the ex post facto clause prohibited the Legislature from giving retroactive effect to amendments having the effect of extending the registration period, the version of SORA in effect when Mr. Starkey became subject to SORA determined the length of his registration period. See Starkey, 2013 OK 43Starkey, the conviction is in a foreign jurisdiction, the offender becomes subject to the provisions of SORA when he or she voluntarily enters and intends to remain in Oklahoma after the conviction. Id. If the conviction is in Oklahoma, the offender becomes subject to the provisions of SORA on the date of his or her conviction. See Cerniglia v. Okla. Dep't of Corrs., 2013 OK 81349 P.3d 542Starkey). This is commonly referred to as the "date of conviction" rule even when an offender becomes subject to SORA by entering the state. The date of conviction rule has been applied to determine whether a person is required to register, the length of the registration period, whether the level assignment system applies, and how frequently the offender must verify his or her registration information.

¶25 Starkey and the date of conviction rule tell us that the law in effect on April 20, 2005--the date of Donaldson's conviction--determines if and for how long Donaldson is subject to SORA. And, as discussed above, that is not in dispute.

¶26 Starkey is not dispositive of the issue presented in this case: whether the statute prohibiting a registered sex offender from residing within a 2,000-foot radius of a city park is punitive. A separate analysis of this specific provision is required.

V. Step One of the Intent-Effects Test: Did the Legislature Intend for the 
Residency Restrictions to be Civil or Criminal?

¶27 We will now apply the analytical framework established in Smith and adopted by this Court in Starkey to determine whether the residency restrictions in 57 O.S.Supp.2019, § 590

¶28 Our initial inquiry in the intent-effects test is whether the legislature intended for the provision to be civil or criminal. See Smith, 538 U.S. at 92-93; Starkey, 2013 OK 43

The Legislature finds that sex offenders who commit other predatory acts against children and persons who prey on others as a result of mental illness pose a high risk of re-offending after release from custody. The Legislature further finds that the privacy interest of persons adjudicated guilty of these crimes is less important than the state's interest in public safety. The Legislature additionally finds that a system of registration will permit law enforcement officials to identify and alert the public when necessary for protecting the public safety.

57 O.S.Supp.1997, § 581Starkey, this Court recognized "[t]he non-punitive objective revealed in § 581 is to protect the public from sex offenders re-offending after release from custody." 2013 OK 4357 O.S., § 590

VI. Step Two of the Intent-Effects Test: Are the Residency Restrictions So 
Punitive, Either in Purpose or Effect, as to Negate that Civil Intent?

¶29 Next, we must weigh whether the effects of the residency restrictions are so punitive as to negate the civil intent. See Smith, 538 U.S. at 92; Starkey, 2013 OK 43Smith, 538 U.S. at 92; see Starkey, 2013 OK 43Mendoza-Martinez factors.

(1) Whether the law imposes an affirmative disability or restraint

¶30 Unlike imprisonment,--"the paradigmatic affirmative disability or restraint"--the residency restrictions do not impose any physical restraints. Smith, 538 U.S. at 100. The residency restrictions in 57 O.S., § 590see Starkey, 2013 OK 43Smith, 538 U.S. at 100), we agree with Donaldson that restraints on where a person may reside are significant and direct. We do not reach this conclusion based on evidence that Donaldson and other sex offenders cannot procure appropriate housing due to a large geographic area being restricted by 57 O.S.Supp.2019, § 590

¶31 We find the residency restrictions impose some degree of affirmative disability or restraint on Donaldson and other sex offenders, which weighs in favor of a punitive effect.Doe v. Miller, 405 F.3d 700, 721 (8th Cir. 2005) (quoting Kansas v. Hendricks, 521 U.S. 346, 363 (1997))." After all, many civil regulations impose an affirmative disability or restraint. For instance, zoning regulations impose similar restraints upon citizens. The degree of restraint must be balanced against the Oklahoma Legislature's countervailing non-punitive purpose. See id.

(2) Whether it has been historically considered punishment

¶32 Donaldson points to this Court's acknowledgment in Starkey that the residency restrictions are analogous to the traditional punishment of banishment. See Starkey, 2013 OK 43

In analyzing this Mendoza-Martinez factor, the Supreme Court of Kentucky determined a similar residency restriction was "regarded in our history and traditions as punishment." The court found the restriction expels registrants from their homes even if they resided there prior to the statute's enactment. The Oklahoma version of SORA is even more restrictive than the Kentucky law because the restrictive distance is twice as large as Kentucky's one-thousand-foot distance.

The expulsion from one's residence is likewise analogous to the traditional punishment of banishment. Again, we are not making a determination of the constitutionality of any of these individual registration requirements but for purposes of analyzing the second Mendoza-Martinez factor we find the totality of these requirements weigh in favor of punishment.

Starkey, 2013 OK 43Commonwealth v. Baker, 295 S.W.3d 437, 444 (Ky. 2009)).

¶33 First, it is important to note that Donaldson is not being forced to move from his residence. Donaldson was convicted and became subject to SORA in 2005. When SORA was first amended to prohibit residing within 2,000 feet of a park in 2006, Donaldson did not own or live on the subject property. Nor did he own or live on the subject property at any time when 57 O.S., § 590even if they lived there prior to the statute's enactment were punitive, is not persuasive here.

¶34 Second, the residency restrictions in 57 O.S.Supp.2019, § 590Shaw v. Patton, 823 F.3d 556, 566-568 (10th Cir. 2016). See also McGuire v. Marshall, 50 F.4th 986, 1008-09 (11th Cir. 2022). The cornerstones of banishment are the "complete expulsion from a community" and "prohibiting offenders from even being present in the restricted area." Shaw, 823 F.3d at 567-68. With this deeper understanding of the historic punishment of banishment, we find that SORA's residency restrictions do not amount to banishment. Section 590(A) does not expel sex offenders from entire communities or ban them from being present in city parks or playgrounds or visiting a home within the restricted area. The Starkey Court recognized as much when it noted that "the offender is prohibited from residing on the property (ostensibly allowing a registered offender the ability to be at the residence, but not "reside" on the property)." Starkey, 2013 OK 4357 O.S., § 590

(3) Whether it is incumbent only on a finding of scienter

¶35 Most, but not all, of the enumerated offenses triggering SORA require scienter. See 57 O.S., § 582Starkey, 2013 OK 43See id.; Smith, 58 U.S. at 105.

(4) Whether its operation promotes the traditional aims of punishment--
retribution and deterrence

¶36 The Starkey opinion alludes to § 590 for a third and final time when the Court observes that SORA promotes deterrence through the threat of negative consequences, such as eviction and living restrictions. See Starkey, 2013 OK 43Smith, 538 U.S. at 102). We agree with this sentiment and several federal appellate courts which have found such an indirect promotion of deterrence does not weigh strongly in favor of a punitive effect. See Shaw, 823 F.3d at 571; Miller, 405 F.3d at 720; Hatton v. Bonner, 356 F.3d 955, 965 (9th Cir. 2004). After all, many civil laws deter crime without imposing punishment. See Smith, 538 U.S. at 102. "To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation." Id. (quoting Hudson v. United States, 522 U.S. 93, 105 (1997)). We find any deterrent purpose is merely incidental. The purpose of the residency restrictions is not so much to deter the commission of the original sex offense that triggered SORA as it is to deter or, more accurately, prevent the sex offender from committing another sex offense in the future. It is the threat of being imprisoned (if caught and convicted) that is intended to deter the original sex crime--not restrictions on where you can live after being released.

¶37 "A statute is retributive if it is intended to express condemnation for a crime and to restore moral balance." Shaw, 823 F.3d at 571 (citing Graham v. Florida, 560 U.S. 48, 71 (2010)). Parroting Starkey and the Kentucky Supreme Court, Donaldson argues that, because the residency restrictions apply across the board without any consideration given to what danger a registrant poses to children, it begins to look like retribution for past crimes rather than a regulation intended to prevent future ones. See Starkey, 2013 OK 43Baker, 295 S.W.2d at 444). Again, the Court's conclusion in Starkey was that extending the number of years one is subject to all of SORA's obligations--not just the residency restrictions--was retributive and weighed in favor of a punitive effect. While it is conceivable that the residency restrictions reflect some degree of societal condemnation, we agree with the Tenth Circuit that prohibiting sex offenders from living within 2,000 feet of certain locations where children are often present is not an expression of condemnation that is sufficiently clear or strong enough to negate the legislature's non-punitive intent. See Shaw, 823 F.3d at 571.

(5) Whether the behavior to which it applies is already a crime

¶38 The residency restrictions--like all provisions of SORA--only apply to people convicted of certain crimes. See 57 O.S.Supp.2020, § 582Mendoza-Martinez factor has a punitive effect." Starkey, 2013 OK 43Smith, 538 U.S. at 105. The Supreme Court of Iowa astutely observed:

The Iowa sex offender registry statute hinges upon a criminal conviction, and thus applies to conduct that is already a crime. However, we find Smith reasoning persuasive. When reducing recidivism is the nonpunitive goal, using a conviction of a sexual offense is a natural and nonsuspect means of achieving that goal. Thus, while this factor weighs in favor of finding the scheme punitive, it does so only slightly.

In Interest of T.H., 913 N.W.2d 578, 594 (Iowa 2018).

(6) Whether it has a rational connection to a nonpunitive purpose

¶39 SORA's rational connection to its nonpunitive regulatory purpose is "a most significant factor" in the intent-effects test. Smith, 538 U.S. at 102 (citing United States v. Ursery, 518 U.S. 267, 290 (1996)) (emphasis added). In Starkey, the Court said: "The protection of its citizens is a basic obligation of state government. Our evaluation of the sixth Mendoza-Martinez factor concludes SORA does advance a non-punitive purpose of public safety." Starkey, 2013 OK 43Shaw court observed, the Oklahoma legislature's strategy is to reduce sex offenders' temptations and opportunities to re-offend through residency restrictions. See Shaw, 823 F.3d at 574. Donaldson concedes that the residency restrictions have a rational connection to the provision's non-punitive objectives of protecting the public by reducing recidivism. This factor weighs heavily in favor of a finding that the residency restriction's effects are not punitive.

(7) Whether it is excessive in relation to this purpose

¶40 Donaldson argues that because there is no individualized assessment of a sex offender's risk for re-offending or propensity for harming children, the residency restrictions are excessive. Donaldson points out that even sex offenders whose victims were adults are prohibited from living near certain areas where children congregate. Donaldson presses this argument despite the fact his victim was a child under the age of 14 and he was designated as an aggravated sex offender.

¶41 "Our inquiry examines the means chosen to carry out this legitimate purpose and determine whether such means are excessive." Starkey, 2013 OK 43Smith, the United States Supreme Court explained that "[t]he excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." Id. ¶ 70, at 1028 (quoting Smith, 538 U.S. at 105) (emphasis added).

¶42 There is one class of sex offenders with respect to the residency requirements. The residency restrictions apply to all persons subject to SORA for as long as they are required to register. There are not different residency restrictions based on a person's risk level, status as an aggravated or habitual sex offender, or the age of the victim. Restricting sex offenders from residing near areas where children congregate may be excessive when applied to persons previously convicted of crimes against adults. However, the Oklahoma Legislature is permitted to make a reasonable categorical judgment that being convicted of certain crimes--even sex crimes against adults--poses some risk to minors. The majority in Smith said:

The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences. . . . The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause.

Smith, 538 U.S. at 103-104. The Oklahoma Legislature made a policy decision that all persons convicted of the sexual offenses enumerated in 57 O.S., § 582See Shaw, 823 F.3d at 576-77; Miller, 405 F.3d at 721-22. As one court said, "the residency restrictions of Jessica's Law are not overbroad, and thus punitive, simply because they do not narrow the affected class to those registered sex offenders who are most likely to attack children." People v. Mosley, 344 P.3d 788, 804 (Cal. 2015). One must bear in mind that "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." Smith, 538 U.S. at 103. It need only be reasonable in light of the nonpunitive objectives. See id. Prohibiting sex offenders from residing within 2,000 feet of a park to carry out the legitimate purpose of protecting the public, specifically, protecting children, is not so excessive it is unreasonable. This factor provides little support for punitive effect.

The punitive effects of the residency restrictions do not clearly outweigh 
SORA's non-punitive purposes

¶43 Considering these factors, we conclude that Donaldson has not presented clear proof that the punitive effects of the residency restriction negates the civil, regulatory purposes of preventing sex offenders from re-offending and protecting the public, specifically children. A law that restricts sex offenders from residing near places where children congregate, such as a park, furthers these non-punitive purposes. The only factor with significant weight in support of punitive effect is that any limitation on where a person may live imposes an affirmative disability or restraint. However, this factor alone does not transform a civil regulation into criminal punishment.

¶44 We hold that prohibiting sex offenders from residing within a 2,000-foot radius of a city park does not impose or increase punishment.57 O.S., § 59057 O.S.Supp.2019, § 59057 O.S., § 590Graham v. Carrington Place Property Owners Ass'n, 2019 OK CIV APP 33456 P.3d 1137

¶45 This case does not present facts where a registered sex offender lives in an unrestricted area at the time a law is enacted or amended that prohibits the sex offender from living in the area within which his residence is located. Nor is Donaldson challenging the constitutionality of 57 O.S.Supp.2007, § 58357 O.S., § 590

VII. United States Constitution

¶46 We also reverse the trial court's conclusion that the retroactive application of 57 O.S.Supp.2019, § 590Shaw v. Patton, 823 F.3d 556 (10th Cir. 2016), and held that the residency restrictionsSee id. at 559-60. Shaw is persuasive. For the reasons stated in Shaw and by this Court in our analysis under the Oklahoma Constitution, we hold that applying the residency restrictions in 57 O.S.Supp.2019, § 590

VIII. Whether Lake El Reno is a "Park" for Purposes of 57 O.S.Supp.2019, § 590(A)

¶47 Because the trial court concluded that the 2019 residency restrictions could not be applied to Donaldson, it did not determine whether material facts, such as whether the subject property was located within a 2,000-foot radius of a city park, were in dispute. The trial court found the issues were moot. As a result of this Court's holding, these issues are no longer moot. However, an appellate court does not make first-instance determinations of disputed issues of either law or fact in the exercise of our appellate jurisdiction. In re Guardianship of Stanfield, 2012 OK 8276 P.3d 98957 O.S.Supp.2019, § 590

CONCLUSION

¶48 The law prohibiting registered sex offenders from residing within 2,000 feet of a city park, 57 O.S.Supp.2019, § 590

ORDER OF THE DISTRICT COURT IS REVERSED
AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.

CONCUR: ROWE, C.J., GURICH, DARBY, KANE, JJ., and HUBER, S.J.

CONCUR IN PART, DISSENT IN PART: KUEHN, V.C.J. (by separate writing)

DISSENT: EDMONDSON and COMBS, JJ. (by separate writing)

DISQUALIFIED: WINCHESTER, J.

FOOTNOTES

The provisions of the Sex Offenders Registration Act, Section 581 et seq. of this title, shall apply to any person residing, working or attending school within the State of Oklahoma who, after November 1, 1989, has been convicted, whether upon a verdict or plea of guilty or upon a plea of nolo contendere, or received a suspended sentence or any probationary term for a crime or an attempt to commit a crime provided for in Section 7115 of Title 10 of the Oklahoma Statutes if the offense involved sexual abuse or sexual exploitation as those terms are defined in Section 7102 of Title 10 of the Oklahoma Statutes, Section 681, if the offense involved sexual assault, 741, if the offense involved sexual abuse or sexual exploitation, Section 843.1, if the offense involved sexual abuse or sexual exploitation, 865 et seq., 885, 886, 888, 891, 1021, 1021.2, 1021.3, 1040.13a, 1040.51, 1087, 1088, 1111.1, 1114 or 1123 of Title 21 of the Oklahoma Statutes.

57 O.S.Supp.2002, § 582

On or after November 1, 1999, any person who has been convicted of a crime or an attempt to commit a crime, received a suspended sentence or any probationary term, including a deferred sentence imposed in violation of subsection G of Section 991c of Title 22 of the Oklahoma Statutes, for a crime provided for in Section 7115 of Title 10 of the Oklahoma Statutes, if the offense involved sexual abuse or sexual exploitation as these terms are defined in Section 7102 of Title 10 of the Oklahoma Statutes, Section 885, 888, 1111.1, 1114 or 1123 of Title 21 of the Oklahoma Statutes shall be subject to all the registration requirements of this act and shall be designated by the Department of Corrections as an aggravated sex offender. An aggravated sex offender shall be required to register for the lifetime of the aggravated sex offender.

57 O.S.Supp.2004, § 584

public or private school site or educational institution." 57 O.S.Supp.2003, § 590

It is unlawful for any person registered pursuant to the Sex Offenders Registration Act to reside, either temporarily or permanently, within a two-thousand-foot radius of any public or private school site, educational institution, playground, park, or licensed child care facility. On the effective date of this act, the distance indicated in this section shall be measured from the nearest property line of the residence of the person to the nearest property line of the public or private school site, educational institution, playground, park, or licensed child care facility; provided, any nonprofit organization established and housing sex offenders prior to the effective date of this provision shall be allowed to continue its operation.

57 O.S.Supp.2006, § 590

57 O.S., § 590park that is zoned by city, county, state, federal or tribal government . . . ." 2007 Okla. Sess. Laws, ch. 261, § 29 (eff. Nov. 1, 2007) (emphasis added).

In 2008, § 590 was amended as follows: "a playground or park that is established, operated or supported in whole or in part by city, county, state, federal or tribal government . . . ." 2008 Okla. Sess. Laws, ch. 347, § 2 (eff. Nov. 1, 2008) (emphasis added).

The residency restriction was expanded again in 2010 to "public or private school site, educational institution, property or campsite used by an organization whose primary purpose is working with children, a playground or park that is established, operated or supported in whole or in part by city, county, state, federal or tribal government, or licensed child care center as defined by the Department of Human Services." 2010 Okla. Sess. Laws, ch. 136, § 2 (eff. Nov. 1, 2010) (emphasis added).

In 2015, the restrictions were again expanded to include parks supported and operated by homeowners' associations: "within a two-thousand-foot radius of any public or private school site, educational institution, property or campsite used by an organization whose primary purpose is working with children, a playground or park that is established, operated or supported in whole or in part by a homeowners' association or a city, town, county, state, federal or tribal government, or a licensed child care center as defined by the Department of Human Services." 2015 Okla. Sess. Laws, ch. 270, § 2 (eff. Nov. 1, 2015) (emphasis added).

In 2018, the residency restriction was expanded once again to include in-home day cares and the victim's residence: "within a two-thousand-foot radius of any public or private school site, educational institution, property or campsite used by an organization whose primary purpose is working with children, a playground or park that is established, operated or supported in whole or in part by a homeowners' association or a city, town, county, state, federal or tribal government, a licensed child care center or family child care home as defined in the Oklahoma Child Care Facilities Licensing Act or the residence of his or her victim." 2018 Okla. Sess. Laws, ch. 145, § 1 (eff. Nov. 1, 2018) (emphasis added).

Starkey v. Oklahoma Department of Corrections, 2013 OK 43305 P.3d 100457 O.S., §§ 582.157 O.S., § 583

57 O.S., § 59057 O.S., § 59057 O.S., § 590See Collins v. Youngblood, 497 U.S. 37, 42-43 (1990).

Smith, the United States Supreme Court said:

The two remaining Mendoza-Martinez factors--whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime--are of little weight in this case. The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern. The obligations the statute imposes are the responsibility of registration, a duty not predicated upon some present or repeated violation.

Smith v. Doe, 538 U.S. 84, 105 (2003).

Starkey rejected the clearest proof standard and adopted an alternative standard set forth in Justice Ginsburg's dissent in Smith v. Doe. While the Starkey opinion does include some discussion of Justice Souter and Justice Ginsburg's dissatisfaction with the clearest proof standard, this Court ultimately applied the clearest proof standard in Starkey. See Starkey, 2013 OK 43

Smith, the United States Supreme Court applied the intent-effects test to Alaska's Sex Offender Registry Act. Prior to the passage of the Alaska Sex Offender Registry Act in 1994, the respondents had been convicted of sexual abuse of a minor, an aggravated sex offense under the Act. See Smith, 538 U.S. at 89-91. The Act required the respondents to register for life and verify their information quarterly. Id. at 91. The United States Supreme Court determined the Act was not punitive; therefore, requiring the respondents to register was not a retroactive punishment prohibited by the ex post facto clause of the United States Constitution. Id. at 105-06.

We decline City and the Attorney General's invitation to revisit and overrule Starkey today. They assert that the Starkey Court wrongly deviated from the United States Supreme Court's decision in Smith v. Doe. Furthermore, they criticize the opinion for failing to provide an explanation of how the ex post facto clause in the Oklahoma Constitution provides greater protection than the ex post facto clauses in the United States Constitution and complain that Starkey has proven to be difficult to implement and enforce.

See Starkey, 2013 OK 43

Id. ¶ 63, at 1027.

See Luster v. State ex rel. Dep't of Corr., 2013 OK 97315 P.3d 386Osburn v. Okla. Dep't of Corr., 2013 OK 89313 P.3d 926Cerniglia v. Okla. Dep't of Corr., 2013 OK 81349 P.3d 542Burk v. State ex rel. Dep't of Corr., 2013 OK 80349 P.3d 545Bollin v. Jones, 2013 OK 72349 P.3d 537Ransdell v. State ex rel. Oklahoma Department of Corrections, 2013 OK 106322 P.3d 1064but see Fry v. Oklahoma Department of Corrections, 2017 OK 77404 P.3d 38

Starkey Court's analysis in step one is somewhat ambivalent, it ultimately determined SORA was intended to be a civil, regulatory scheme to help prevent sex offenders from re-offending. See 2013 OK 43

Shaw v. Patton, 823 F.3d 556 (10th Cir. 2016). The Tenth Circuit concluded: "In our view, Oklahoma's residency restrictions are not sufficiently harsh to constitute an affirmative disability or restraint that has a punitive effect." Id. at 571. The Shaw court focused on the burden or inconvenience of needing to verify that a prospective residence is not within 2,000 feet of a restricted area, not the disability or restraint imposed by limiting one's housing options. See id. at 570. We do, however, agree with the Tenth Circuit that the additional effort necessary to ensure compliance with the law when relocating is minor and indirect. Id.

The Shaw court noted that 57 O.S., § 59057 O.S.Supp.2008, § 590Shaw, 823 F.3d at 570. The Shaw court further observed that there is no exception if the sex offender's residency predates a newly established school, educational institution, property or campsite used by an organization whose primary purpose is working with children, playground, or his or her victim moves within 2,000 feet of the sex offender's residence. The lack of exceptions for these new establishments is not before the Court today.

McGuire v. Marshall, 50 F.4th 986, 1008 (11th Cir. 2022) (Alabama law); Shaw, 823 F.3d at 577 (Oklahoma law); Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1017 (8th Cir. 2006) (Arkansas law); Doe v. Miller, 405 F.3d 700, 720 (8th Cir.2005) (Iowa law); Hatton v. Bonner, 356 F.3d 955, 965 (9th Cir.2003) (California law); Doe 1 v. City of Apple Valley, 487 F. SupP.3d 761, 774 (D. Minn. 2020) (Minnesota law); People v. Mosley, 344 P.3d 788, 804 (Cal. 2015) (California law); People v. Leroy, 828 N.E.2d 769, 782 (Ill. App. 2005) (Illinois law since repealed); Standley v. Town of Woodfin, 650 S.E.2d 618, 622-23 (N.C. App. 2007), aff'd by Standley v. Town of Woodfin, 661 S.E.2d 728 (N.C. 2008) (city ordinance); City of S. Milwaukee v. Kester, 2013 WI App 50, ¶ 31, 830 N.W.2d 710, 721 (city ordinance); but see, e.g., State v. Pollard, 908 N.E.2d 1145, 1152 (Ind. 2009) (finding residency restrictions were punitive as applied to sex offender because he already owned and lived in the house when the law was enacted); Commonwealth v. Baker, 295 S.W.3d 437, 444 (Ky. 2009) (finding KRS 17.545, which forced sex offenders to move even if their residency predated the statute or establishment of a new school, day care, or playground, to be punitive).

57 O.S., § 590. See Question Submitted by: Honorable Brian A. Crain, State Senator, District 39, 2005 OK AG 11

Furthermore, nothing in today's Opinion affects a registered sex offender's right to own property after the date of conviction or the enactment or amendment of a law, which prohibits a sex offender from residing in the area within which the subject property is located. Since the Legislature first enacted residency restrictions in 2003, the following statutory language has remained unchanged: "Nothing in this provision shall require any person to sell or otherwise dispose of any real estate or home acquired or owned prior to the conviction of the person as a sex offender." Compare 57 O.S.Supp.2003, § 59057 O.S.Supp.2019, § 590residing on or occupying property located within a restricted area.

Shaw concerned the 2009 version of the statute, which included a similar park restriction. See 57 O.S.Supp.2008, § 590

 

 

KUEHN, V.C.J., CONCURRING IN PART and DISSENTING IN PART:

¶1 I agree that Donaldson is subject to the current residency requirements of the Oklahoma Sex Offender Registration Act (SORA). 57 O.S.Supp.2019, § 590

¶2 The United States Supreme Court provides the framework for our SORA analysis. Smith v. Doe, 538 U.S. 84 (2003). First, we must determine whether the Legislature intended the statutory scheme to be civil or punitive in nature -- whether it was meant to impose punishment. Smith, 538 U.S. at 92. I believe that SORA is, on its face, a civil Act; its stated aim is to protect public safety and aid law enforcement. 57 O.S. § 581Smith, 538 U.S. at 92.

¶3 In Starkey, this Court determined that a revised sex offender risk level assignment system, extending the registration period, was punitive and could not be retroactively applied. Starkey v. Oklahoma Department of Corrections, 2013 OK 43Id. However, Starkey's broad language has been read to suggest that SORA was punitive in its entirety; indeed that interpretation is argued by Donaldson and the dissent. Even the limited ruling in Starkey, and certainly its supposed broader application, make it an outlier. In Smith itself, the United States Supreme Court concluded that the Alaska sex offender registration act was not punitive and could be applied retroactively. Smith, 538 U.S. at 105-06. And while acknowledging Starkey, even the Oklahoma Court of Criminal Appeals has found explicitly that sex offender registration is neither part of a range of criminal punishment nor a material consequence of sentencing and, thus, not a matter for jury consideration. Reed v. State, 2016 OK CR 10373 P.3d 118

¶4 Starkey is unworkable and must be overturned. As this case shows, Starkey is taken both as a narrow ruling affecting only a single, isolated part of SORA and as a broad ruling barring any application of SORA retroactively. This is in large part because the Starkey language encourages both interpretations. The dissent suggests that Donaldson and the trial court were correct in applying Starkey broadly, while the Majority insists it is limited to its facts. Both these things cannot be true.

¶5 I cannot join the dissent. Justice Combs authored both Starkey and the dissent in this case. In dissent here he argues that Starkey focused on SORA's punitive effect (the second half of the SORA analysis) rather than its punitive intent. However, he rejects the Majority's suggestion that Starkey supports a conclusion that SORA is civil in nature and only punitive in effect. Justice Combs makes clear that, had the Starkey Majority analyzed the Legislature's intent, it would have concluded SORA was intended to be punitive. I cannot agree either that the SORA requirements here increase Donaldson's punishment, or that the Legislature intended SORA to be punitive in part or as a whole. After reviewing its language, history and effect I would find SORA is a civil statute in its entirety.

¶6 But I cannot join the Majority either, because of how it handles Starkey. The first question in analyzing SORA is whether it is civil or punitive in intent. The Starkey parties wanted an answer to that question one way or the other, but this Court didn't give them one. Instead of following the United States Supreme Court's example in Smith, we refused to consider SORA as a whole. I believe we should have done so. If we find SORA is civil once, we don't have to find it again in every case. Going forward the burden will always be on the sex offender to show that a specific SORA provision is punitive as applied to him. That is, if we once find that SORA as a whole is civil, the presumption is that its provisions may always apply retroactively; only if a court finds that a provision is punitive in effect must it be applied prospectively. This would reduce the litigation surrounding SORA and simplify SORA claims. The Majority recognizes that Starkey itself limited its finding that SORA was punitive to the registration requirement -- that it refused to consider SORA as a whole. And then the Majority does the same thing. The Majority reviews only the residency requirement, leaving the rest for another day. So there is still no finality, no initial presumption that the SORA statutory provisions apply to every sex offender. Consequently, the State will have to prove that SORA is civil over and over again, in every case, before the sex offender must show a particular provision is punitive in effect.

¶7 Future trial and appellate courts will have to decide, for every SORA requirement and amendment the Legislature imposes, whether it was initially intended to be civil or criminal. I do not believe this piecemeal approach to the entirety of SORA helps anyone affected by it or represents a wise use of judicial resources. This will lead to more uncertainty for both trial courts and the sex offenders subject to SORA. Our simplest and most prudent course is to follow the example set by Smith and determine that SORA was intended to be a civil statute. The rights of all parties remain protected, because a court can still determine whether a particular requirement may be so punitive in effect that it cannot be applied retroactively. Thus, I would overrule Starkey insofar as it may hold that any portion of SORA is punitive.

¶8 I do not reach this conclusion lightly. Normally, stare decisis would compel us to somehow reconcile the Starkey analysis and holding with other case law and the statutory provisions at issue here. The Majority attempts to do just that. But, particularly where constitutional rights are concerned, our focus must be not just on respecting precedent but also on making sure that the precedent is right; we must be willing to correct bad law. Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 264 (2022). Mere disagreement is not enough; this requires more than a belief that the decision was wrong. Allen v. Cooper, 389 U.S. 248, 259 (2020). Justice Kavanaugh summarized the factors used by the United States Supreme Court when deciding whether to overturn a prior decision: (1) the quality of the precedent's reasoning; (2) its consistency and coherence with earlier or later decisions; (3) whether facts or law have changed since the prior decision; (4) whether it is still workable; (5) the reliance interests of those who have relied on the precedent; and (6) its age. Ramos v. Louisiana, 590 U.S. __, 140 S.Ct. 1390, 1414 (2020) (Kavanaugh, J., concurring in part). This Court, with different language, has broadly articulated very similar factors: (1) whether the rule is unworkable; (2) whether persons relying on it would be subject to hardship were it overruled; and (3) whether the law or facts have changed to the point that the old rule is abandoned, cannot be justified or applied. Rodgers v. Higgins, 1993 OK 45871 P.2d 398

¶9 Taken together these factors support my conclusion. First, age; this 2013 decision is too recent to have resulted in decades of reliance that would weigh against overturning the ruling. And second, consistency: while Starkey isn't long-standing, it is certainly inconsistent with decisions from other jurisdictions and Oklahoma.Starkey's reasoning is so uncertain that even this Court can't agree on what it says, much less what it means. As this case shows, lower courts have even less certainty. Because of this, the constituency which must effect the SORA statutory requirements -- law enforcement, courts, probation and parole officers, victims, and sex offenders themselves -- have been confused as to what provisions apply to whom, when, and what date must be used to determine that. No single section of the Starkey ruling clearly answers those questions, and the numerous amendments to SORA make them ever more difficult to answer under the Starkey formulation. Each individual case may need numerous calculations with different results based on each individual requirement.

¶10 If the Starkey process was ever workable, it isn't now, on either an individual or systemwide level. What a sex offender must do may, in practice, depend on how courts and law enforcement in his county interpret SORA in light of Starkey. Multiply this by each registered sex offender, over time, and the system is unworkable. Sex offenders and law enforcement have been constrained to follow Starkey for the past twelve years but given the confusion the decision has caused one cannot say they relied on it. An overarching decision that SORA is a civil statute would clarify the law and simplify the process, benefiting all the stakeholders. Overruling Starkey would allow courts to give effect to every Legislative provision -- for instance, some are given retroactive effect while others are not -- and provide a framework that would serve interested parties better than the uncertainty surrounding Starkey. They would be helped, not subject to hardship, should this rule be abandoned. The full Latin phrase is "stare decisis et non quieta movere -- stand by the thing decided and do not disturb the calm. . . ." James C. Rehnquist, Note, The Power That Shall be Vested in a Precedent: Stare Decisis, the Constitution, and the Supreme Court, 66 B.U. L. Rev., 345, 347 (1986). Starkey has brought a decade of confusion, not calm, and I would no longer stand by its decision that SORA, or any portion of it, is punitive in intent.

¶11 Because I find that SORA is civil in nature, I would narrow our analysis to the requirement before us: is the residency requirement in Section 590(A) so punitive in effect that it cannot be applied retroactively to Donaldson? If not, then the overall civil nature of the statute controls and it applies to him.

¶12 The Supreme Court set out the appropriate review using seven factors:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment--retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. . . .

Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963).

¶13 I believe the record is inadequate to show by the clearest proof that Section 590(A) is punitive in effect. I agree with the Majority that based on common sense and ordinary principles of statutory interpretation, the factors looking at scienter, deterrence, and already criminalized behavior do not support a finding of punitive effect. But other factors are more difficult to evaluate. Because Donaldson chose to immediately file for summary judgment, and the trial court made its decision based on that motion, there was no factual record compiled below. Without facts, we cannot fully apply the factors. For instance, on its face, Section 590(A) allows Donaldson freedom of movement throughout the state. But given the scope of the statute's residency prohibitions, does it effectively banish him from living in El Reno? We don't know. We have no evidence to consider. Looking at other factors, do the Section 590(A) residency restrictions advance the purpose of public safety, and are they excessive, as applied, related to that purpose? Other jurisdictions have answered those questions for their statutes based on facts particular to those cases. But those decisions can be persuasive only insofar as they compare to the facts and application of Oklahoma's statute. There's no evidence we can use to make that comparison.

¶14 I would find that SORA is a civil statute and overrule Starkey. Applying the clearest proof standard, I would further find that, on the record in this case, the residency requirements of Section 590(A) are not so punitive in effect that they cannot be applied retroactively. Donaldson is subject to the residency requirements. For this reason I agree with the Majority's conclusion that the trial court's decision must be reversed and the case remanded for further proceedings.

FOOTNOTES

Starkey held the registration requirement was punitive in effect, not intent, that distinction does not change my analysis. I disagree with either or both findings. I would, however, leave undisturbed the results of prior cases decided in reliance on Starkey and my ruling would be prospective only.

See, e.g., Reed v. State, 2016 OK CR 10373 P.3d 118People ex rel. Rivera v. Superintendent, Woodbourne Corr. Facility, 221 N.E.3d 1, 7 (N.Y. 2023); State v. Eighth Jud. Dist. Ct. (Logan D.), 306 P.3d 369, 376 (2013); State v. Trosclair, 2011-2302 (La. 5/8/12), 89 So.3d 340, 350. Other jurisdictions have found similar statutes to be civil in nature. Georgia Dept. of Human Servs. v. Steiner, 303 Ga. 890, 815 S.E.2d 883, 900 (2018) (child abuse registry); In re Commitment of Fisher, 164 S.W.3d 637, 653 (Tex. 2005) (commitment of sexually violent predators). The Tenth Circuit declined to follow Starkey in determining that reporting and residency restrictions were civil rather than punitive; that Court noted that Starkey was decided on Oklahoma constitutional grounds and that this Court "disavowed" any obligation to follow federal precedent, including Smith. Shaw v. Patton, 823 F.3d 556, 563 (10th Cir. 2016)

 

 

COMBS, J., with whom EDMONDSON, J., joins, dissenting:

¶1 I respectfully dissent from the majority's reversal of the trial court's summary judgment in favor of Mr. Donaldson and against the City of El Reno. When Mr. Donaldson was convicted by guilty plea on April 20, 2005, § 590 of Oklahoma's Sex Offender Registration Act (SORA) restricted him only from "resid[ing] within a two thousand-foot radius of any public or private school site or educational institution." See 57 O.S.Supp.2004, § 590fourteen years later (i.e., in 2019), which adds restrictions to prevent him from "resid[ing], either temporarily or permanently, within a two-thousand-foot radius of any . . . property or campsite used by an organization whose primary purpose is working with children, a playground or park that is established, operated or supported in whole or in part by a homeowners' association or a city, town, county, state, federal or tribal government, a licensed child care center or family child care home as defined in the Oklahoma Child Care Facilities Licensing Act or the residence of his or her victim," 57 O.S.2021, § 590See, e.g., City's Br. 1, 3; ROAA, Doc. 5, City's Combined Resp. to Pl.'s Mot. Summ. J. & Countermot. Summ. J. & Br. in Supp. 2, 4. These additional residency restrictions serve to retroactively increase the punishment for Mr. Donaldson's 2005 conviction in violation of the ex post facto clause in Article II, § 15 of the Oklahoma Constitution. The trial court correctly determined "that the version [of § 590] in effect at the time of Plaintiff's conviction controls his registration requirements" and that "[a]pplying the November 1, 2019 version of 57 O.S. Supp. 2019 § 590

¶2 I reach this conclusion because I disagree with the majority on three major points in their application of the "intent-effects" test that this Court adopted in Starkey v. Oklahoma Department of Corrections, 2013 OK 43305 P.3d 1004Mendoza-MartinezSee id. ¶¶ 19, 37, 43 & n.10. Third, I disagree with the majority's conclusion that the seven Mendoza-Martinez factors fail to demonstrate that the overall effects of the statute are so punitive as to negate any legislative intent to create a civil regulatory scheme. See id. ¶¶ 43--44.

A. Legislative Intent

¶3 The first prong of the "intent-effects" test requires us to analyze whether the Oklahoma Legislature expressed an "intent to make SORA and/or its amendments punitive." Starkey, 2013 OK 43Seling v. Young, 531 U.S. 250, 262 (2001) (citing Hudson v. United States, 522 U.S. 93 (1997)); accord In re W.M., 851 A.2d 431, 441 (D.C. 2004) (citing Seling); State v. Langdon, 472 P.3d 31, 36 (Haw. Ct. App. 2020) (quoting Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 159 P.3d 143, 152 (Haw. 2007)); State v. Meredith, 399 P.3d 859, 863 (Kan. 2017) (looking at text and legislative history); State v. Burr, 1999 ND 143, ¶ 13, 598 N.W.2d 147, 153 (same); State v. Hamann, 422 P.3d 193, 197 (Or. 2018); In re Commitment of Fisher, 164 S.W.3d 637, 646--47 (Tex. 2005) (citing Seling). We look at the text of the legislative enactment and its overall structure to ascertain whether "the legislature indicate[d] a preference either expressly or impliedly for a civil label or a criminal label." Starkey, 2013 OK 43United States v. Ward, 338 U.S. 242, 248 (1980)). That said, simply labeling a law as "civil" or "procedural" will not immunize it from scrutiny under the ex post facto clauses because subtle violations are no more permissible than overt ones. Id. ¶ 41, 305 P.3d at 1019--20 (citing Collins v. Youngblood, 497 U.S. 37, 46 (1990)). Secondarily, this Court also takes note of other formal attributes of the legislative enactment such as the manner of its codification within a certain statutory title and the enforcement procedures it establishes. See Smith v. Doe, 238 U.S. 84, 92, 94 (2003).

¶4 Nothing in Starkey answered this initial inquiry of the "intent-effects" test. The reason we didn't address this first prong is because of our conclusion that "[t]he second part of the test, whether SORA's effects are punitive, is dispositive." Starkey, 2013 OK 43Even if we assume the act as amended was intended to be a civil regulatory scheme[,] that fact does not dispose of the issue." Id. (emphasis added). Such assumptions are not out of the ordinary, but are regularly employed by courts utilizing the intent-effects test. E.g., Shaw v. Patton, 823 F.3d 556, 562 (10th Cir. 2016) ("We ordinarily start with the legislature's stated intent. But Mr. Shaw has not argued that the Oklahoma legislature's stated intent is punitive. See Appellant's Opening Br. at 20 ("In the present case, Mr. Shaw has not attempted to prove that [the Oklahoma statute's] stated legislative intention was punitive, due to ambivalent evidence."). Thus, we express no view on the Oklahoma legislature's intent in enacting the sex-offender requirements." (emphasis added)); Doe v. State, 189 P.3d 999, 1007 (Alaska 2008) ("It is not necessary to address the first step of the test--whether the legislature intended [the] A[laska ]SORA to punish convicted sex offenders--because the second part of the test--whether ASORA's effects are punitive--resolves the dispute before us. Assuming without deciding that the legislature intended ASORA to be non-punitive, we therefore focus on the statute's effects to determine whether they are punitive." (footnotes omitted) (emphasis added)).

¶5 Nevertheless, the majority has selected statements from Starkey favoring its conclusion that "the legislative intent of SORA is not to punish" while ignoring other statements from Starkey disfavoring that conclusion. For instance, the majority asserts: "In Starkey, this Court recognized '[t]he non-punitive objective revealed in § 581 is to protect the public from sex offenders re-offending after release from custody.'" Majority Op. ¶ 28 (quoting Starkey, 2013 OK 43Starkey's "analysis in step one is somewhat ambivalent" but that "the Starkey Court ultimately determined SORA was intended to be a civil, regulatory scheme to help prevent sex offenders from re-offending." Id. ¶ 28 n.16 (citing Starkey, 2013 OK 43

¶6 All these references seem to suggest that Starkey reached a result that, in actuality, it never did. Just read the entire paragraph cited by the majority for yourself:

¶43 The legislative purpose appears to be the creation of a system to help prevent sex offenders from re-offending by permitting law enforcement to identify sex offenders and alert the public of such sex offenders when necessary. The stated intent seems to apply to sex offenders who commit "other predatory acts against children" and persons who prey on others because of "mental illness." The provisions of SORA, however, are not just geared towards repeat sex offenders or offenders with mental illness. SORA also applies to first time offenders and persons who have not been determined to suffer from a mental illness. This subsection is the only overt attempt to establish a purpose for SORA and has not been amended since its creation in 1997. This subsection does not expressly designate SORA's requirements as "civil." Justice Souter noted in his concurring opinion in Smith that other United States Supreme Court cases relied heavily on the legislature's stated label in finding a civil intent. [238 U.S. at 107--08 (Souter, J., concurring in judgment).] Although there is evidence pointing to a civil intent, there is considerable evidence of a punitive effect. Even if we assume the act as amended was intended to be a civil regulatory scheme that fact does not dispose of the issue. The second part of the test, whether SORA's effects are punitive, is dispositive.

Starkey, 2013 OK 43Starkey Court did not characterize the "system to help prevent sex offenders from re-offending" as a "civil, regulatory scheme." Instead, relying upon Justice Souter's separate writing from Smith v. Doe, the Starkey Court observed that a finding of civil intent ordinarily depends heavily upon the existence of an explicit label that the law is "civil" or "regulatory"--something that was lacking in § 581 of SORA.See id. Justice Souter's separate writing from Smith rightly determined that, although "[t]hese formal facts do not force a criminal characterization, . . . they stand in the way of asserting that the statute's intended character is clearly civil." Smith, 238 U.S. at 108 (Souter, J., concurring in judgment) (emphasis added). That's why the Starkey Court concluded in the very next paragraph that "there is no clear legislative categorization that SORA is a civil law" and why any determination of legislative intent was abandoned in favor of deciding the appeal based solely on the second prong. Starkey, 2013 OK 43Oklahoma Law Review read Starkey this way, observing "[t]he court determined that the Oklahoma legislature's intent in enacting the original registration act was unclear" and "the court concluded the legislative intent was not clearly established." Alex Duncan, Note, Calling a Spade a Spade: Understanding Sex Offender Registration as Punishment and Implications Post-Starkey, 67 Okla. L. Rev. 323, 341 (2015). But today's majority ignores Starkey's endorsement of Justice Souter's wise counsel, recharacterizes Starkey's conclusion on this first prong, and proceeds to conclude without much analysis that the residency restrictions "prohibit[ing] sex offenders from living near areas where children congregate[] are part of the civil, regulatory system intended to reduce recidivism and protect the public, specifically children." Majority Op. ¶ 28.

¶7 A better analysis of legislative intent would include a discussion of the history of sex offender legislation in Oklahoma. Oklahoma's sex offender registration scheme has been codified in various titles of the Oklahoma Statutes; it has not been confined to the provisions we refer to as SORA (i.e., 57 O.S.2021, §§ 581See Sex Offenders Registration Act (SORA), ch. 212, §§1--7, 1989 Okla. Sess. Laws 556, 556--58 (codified at 57 O.S.Supp.1989, §§ 581id. § 8, 1989 Okla. Sess. Laws at 558--59 (codified at 51 O.S.Supp.1989, § 24A.8Starkey or the residency restrictions at issue in Mr. Donaldson's case), we can better assess both (1) whether the Oklahoma Legislature intended for Oklahoma's sex offender registration scheme to be punitive or civil and (2) whether the effects of the specific provisions challenged by Mr. Donaldson, in particular, and of Oklahoma's sex offender registration scheme, in general, are so punitive as to negate any intention to deem them civil. This holistic approach is more in tune with the Starkey Court's consideration of "SORA's various requirements--including residency restrictions--and their cumulative effects [in] determin[ing] if [the specific provisions at issue in the case] w[ere] punitive." Majority Op. ¶ 23; see also id. ¶ 21 (emphasizing that "[t]he Starkey Court determined that the cumulative effects of SORA's requirements and restrictions were punitive" (citing Starkey, 2013 OK 43

1. History of Oklahoma's Sex Offender Legislation 

a. 1989 Enactment of SORA

¶8 SORA was originally enacted on May 9, 1989, when Governor Henry Bellmon signed House Bill 1136 into law.

AN ACT RELATING TO PRISONS AND REFORMATORIES; ESTABLISHING THE SEX OFFENDERS REGISTRATION ACT; PROVIDING SHORT TITLE; REQUIRING THE REGISTRATION OF CERTAIN PERSONS; PROVIDING FORM OF REGISTRATION; PROVIDING FOR MAINTENANCE OF REGISTRATION FILE; RESTRICTING ACCESS TO FILE INFORMATION; REQUIRING CERTAIN NOTIFICATION; PROHIBITING CERTAIN ACTS AND PROVIDING PENALTIES THEREFOR; AMENDING SECTION 8, CHAPTER 255, O.S.L. 1985 (51 O.S. SUPP. 1988, SECTION 24A.8), WHICH RELATES TO THE OKLAHOMA OPEN RECORDS ACT; PROVIDING THAT CERTAIN FILES SHALL NOT BE AVAILABLE FOR PUBLIC INSPECTION; PROVIDING FOR CODIFICATION; PROVIDING FOR SEVERABILITY; AND PROVIDING AN EFFECTIVE DATE.

Section 1 of H.B. 1136 gave SORA its name.

¶9 During that same session, Oklahoma legislators created a sex offender treatment program. Going into session, officials at the DOC requested $500,000 to implement a proposed psychological treatment "program developed in Oregon that use[d] aversion therapy--electrical shocks and ammonia vapors--to discourage deviant fantasies."

b. 1995 Sex Offender Legislation: Public Inspection 
of SORA Records and the Start of Job Restrictions

¶10 In 1994, Congress had passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act in the wake of the high-profile abduction of the bill's eleven-year-old namesake in Minnesota in late 1989.

¶11 In light of the Wetterling Act, the Oklahoma Legislature needed to revamp SORA to require registration with local law enforcement agencies instead of, or in addition to, the DOC. In House Bill 1207, lawmakers amended SORA to require registration both with DOC for ten (10) years and "[w]ith the local law enforcement authority having jurisdiction in the area where the person resides or intends to reside for more than seven (7) days" for five (5) years.

¶12 But H.B. 1207 went one step further than amending SORA. It also amended § 404.1 of the Oklahoma Child Care Facilities Licensing Act to make it unlawful for any sex offenders "to work with or provide services to children and for any employer who offers or provides services to children to knowingly and willfully employ or allow continued employment of" a sex offender, with violations subjecting both the sex offender and the daycare facility to a civil fine of $1,000 and civil liability in court.

c. 1997 Sex Offender Legislation: Public Notification, 
Expansion of Qualifying Crimes, Making SORA 
Violations a Felony, and Interfering with Sex 
Offenders' Ability to Maintain Child Custody

¶13 Two years later, the Oklahoma Legislature further amended SORA after another high-profile sex crime and related federal legislation. In Hamilton Township, New Jersey, seven-year-old Megan Kanka had been abducted, raped, and murdered in 1994 by her neighbor who had two prior convictions for sex crimes against young children.

¶14 Oklahoma lawmakers followed suit shortly thereafter on May 27, 1997, passing several amendments to SORA in House Bill 1729.

§ 581 of SORA to add a "findings" subsection:

The Legislature finds that sex offenders who commit other predatory acts against children and persons who prey on others as a result of mental illness pose a high risk of re-offending after release from custody. The Legislature further finds that the privacy interest of persons adjudicated guilty of these crimes is less important than the state's interest in public safety. The Legislature additionally finds that a system of registration will permit law enforcement officials to identify and alert the public when necessary for protecting the public safety.

H.B. 1729 also amended § 584 of SORA to implement the notification requirements in Megan's Law. The DOC could promulgate rules to make information contained in its registry "available for public inspection."

¶15 But H.B. 1729 went farther than Megan's Law. It amended § 582 of SORA to include new crimes that would serve as the basis for sex offender registration--including some crimes against children that did not entail sexual misconduct at all.before the offender establishes residence"after the change of address."

¶16 But like its 1995 predecessor, H.B. 1729 went farther than just amending SORA. Yet again § 404.1 of the Oklahoma Child Care Facilities Licensing Act was amended to impose criminal liability on top of the existing civil fine and civil liability; thenceforth, going to work as a sex offender for a childcare facility would constitute a felony punishable by incarceration up to five (5) years, a fine of up to $5,000, or both such fine and imprisonment.

¶17 During that same session, Oklahoma legislators enacted House Bill 1927, part of which significantly impacted sex offenders and their families. The first section of that bill amended the statute governing the preference order for child custody and guardianship.

d. 1998 Sex Offender Legislation: Lifetime Registration 
for Habitual Offenders and More Job Restrictions

¶18 The very next year, the Oklahoma Legislature amended SORA again. House Bill 3144 amended § 584 of SORA to relabel "predatory" sex offenders as "habitual" sex offenders and to impose lifetime registration upon such habitual offenders.

¶19 That same session, Oklahoma legislators enacted Senate Bill 1394 to prevent sex offenders from working on school premises. S.B. 1394 enacted a new provision of law in SORA, § 589, which made it "unlawful for any person registered pursuant to the Sex Offenders Registration Act to work with or provide services to children or to work on school premises" and for anyone to employ a registered sex offender for purposes of providing services to children or performing work on school premises.

e. 2001 and 2002 Sex Offender Legislation: Juvenile 
Registration, More Job Restrictions, and the Specter 
of Chemical Castration

¶20 Each year, the Legislature continued to tweak sex offender registration. In 2001, the biggest development was the enactment of the Juvenile Sex Offender Registration Act. 
f. 2003 Sex Offender Legislation: Creation of SORA's 
Residency Restrictions and of the Penal Code's "Zones 
of Safety"

¶21 Leading up to the 2003 session, local newspapers reported on a sex offender who lived across the street from Pleasant Hill Elementary School in the Mid-Del School District.

¶22 The title of Rep. Cox's H.B. 1501 was "An Act relating to the Sex Offenders Registration Act; restricting residency of persons required to register, providing an exception; providing penalty; providing for codification; and providing an effective date."

¶23 The title of Sen. Nichols's S.B. 554 was "An Act relating to crimes and punishments; creating certain safety zone against certain offenders on certain property; stating distance for safety zone property; providing penalties for violation; excepting certain offenders from safety zone for certain purpose; constructing certain provision; providing exception to prosecution as habitual offender; providing for codification; and declaring an emergency."

g. 2004 and 2005 Sex Offender Legislation: 
Lengthening the Registration Period, Electronic 
Monitoring, and More Job Restrictions

¶24 Legislation affecting sex offenders continued to be a perennial favorite. In 2004, Oklahoma lawmakers passed Senate Bill 1191 amending § 583 of SORA to expand the registration period for non-habitual and non-aggravated offenders to "ten (10) years from the date of completion of the sentence," which they defined as "mean[ing] the day an offender completes all incarceration, probation and parole pertaining to the sentence"
 

h. 2006 Sex Offender Legislation: Expansion of SORA's
Residency Restrictions and of the Penal Code's Safety 
Zones, and Beyond

¶25 Moving ahead to 2006, both chambers of the Legislature were busy with initiatives, agendas, and bills targeting sex offenders. In the House, four sex offender bills were introduced--i.e., House Bills 2381, 2569, 2830, and 2839--but none were passed. Concurrently in the Senate, seven sex offender bills were introduced--i.e., Senate Bills 1426, 1707, 1708, 1747 (eventually incorporated into 1800), 1754, 1755, and 1964--and four were enacted. To get the full picture of legislative intent concerning sex offenders, all the bills are discussed below.

¶26 After a constituent notified Representative Lance Cargill of Harrah "about the daily trauma her 14-year-old daughter was experiencing by having to attend the same school as her rapist, who was a minor-aged classmate," Rep. Cargill introduced H.B. 2381, which would prevent student-aged sex offenders from attending the same school or riding the same bus as their victim or their victim's sibling(s).

¶27 Representative Ryan Kiesel of Seminole introduced H.B. 2569, which would add new sections to SORA requiring sex offenders to be assessed and assigned a risk level to determine what degree of community notification was needed.

¶28 "The fight against sex offenders continue[d]" with H.B. 2830, authored by Representative Lisa Billy of Purcell.to wage the war against sex crimes."

¶29 Speaker Todd Hiett of Kellyville introduced the "Keeping Oklahoma Kids Safe" initiative, which was touted as "a key goal of the House Republican caucus of the 2006 legislative session."these demented criminals behind bars and keep[] them there for as long as possible."

¶30 Senator Brian Crain of Tulsa introduced S.B. 1426, which would require registered sex offenders to obtain new driver licenses bearing the words "Sex Offender."

¶31 As "another step in the legislature's fight to protect the public from sexual predators," Senator David Myers of Ponca City introduced S.B. 1707 to "ensur[e] that more governmental agencies have access to the registry."

¶32 Senator Jonathan Nichols of Norman introduced S.B. 1708, which originally was intended to amend the residency restrictions in § 590 of SORA both to include daycare facilities and to expand the restricted radius from 2,000 feet to ½ mile.

¶33 Senator Jay Paul Gumm of Durant introduced S.B. 1747, which sought to add the death penalty as a punishment option for repeat sex offenders whose victims were minor children.w]e will find you, we will prosecute you, and we will put you to death."

¶34 Senator Glenn Coffee of Oklahoma City introduced S.B. 1754, which would require businesses whose employees enter individual residences both to verify whether its employees are registered sex offenders and to notify residents about the sex offender status of any employee who will be sent to the home.

¶35 Senator Nancy Riley of Tulsa introduced S.B. 1755, which originally was intended to clean up some language in § 583 of SORA concerning who was required to register.

An Act relating to sex offenders and children; . . . amending Section 1, Chapter 209, O.S.L. 2003 (21 O.S. Supp. 2005, Section 1125), which relates to safety zone; adding locations to certain safety zone; prohibiting sex offenders from being within certain distance of safety zone; increasing penalties; adding certain exemption; . . . amending Section 1, Chapter 223, O.S.L. 2003 (57 O.S. Supp. 2005, Section 590), which relates to prohibition for sex offenders to live within certain radius of certain places; adding prohibited places; determining calculation of certain distance; exempting certain nonprofit from certain distance prohibition; increasing penalty for certain violation; setting penalty for second or subsequent violation; prohibiting sex offenders from residing in certain dwelling; setting penalties; construing certain provisions; prohibiting certain contracts for housing sex offenders; prohibiting certain housing of sex offenders in certain locations; defining terms; providing for codification; and declaring an emergency.

S.B. 1755's amendments to the residency restrictions and safety zone provisions in S.B. 1755 were codified in Title 21 of the Oklahoma Statutes concerning "Crimes & Punishment" and in Title 57 concerning "Prisons & Reformatories."

¶36 Lastly, Senator Kenneth Corn of Poteau introduced S.B. 1964, which was originally intended only to require three years of community supervision for convicted sex offenders after their release from prison.

An Act relating to corrections; . . . amending Section 4, Chapter 457, O.S.L. 2005 (47 O.S. 2005, Section 6-105.3), which relates to identification cards; requiring sex offenders to have limited term for identification cards; providing annual renewal; setting cost the same as other identification cards; amending 47 O.S. 2001, Section 6-115, as last amended by Section 40, Chapter 5, O.S.L. 2004 (47 O.S. Supp. 2005, Section 6-115), which relates to driver licenses; making certain driver licenses valid for limited period of time; providing for application, renewal and cost of certain driver licenses for certain persons; . . . amending Section 1, Chapter 223, O.S.L. 2003 (57 O.S. Supp. 2005, Section 590), which relates to residential restrictions for sex offenders; including additional locations in certain prohibition; clarifying measurement; construing effect of prohibition; increasing penalty; providing penalty for second or subsequent offense; providing an effective date; and declaring an emergency.

S.B. 1964's amendments to the residency restrictions were codified in Title 57 concerning "Prisons & Reformatories," but the provisions regarding community supervision and driver license renewals were codified in Title 22 concerning "Criminal Procedure" and in Title 47 concerning "Motor Vehicles."

i. 2007 Sex Offender Legislation: A 3-Tiered Risk Level
Assessment System, Lengthened Registration Periods for 
Non-Aggravated Offenders, Clarification of Residency 
Restrictions and Safety Zones, Driver's License Labels, 
and Beyond

¶37 In 2007, both chambers were again busy with platforms and bills targeting sex offenders. In the House, eight sex offender bills were introduced--i.e., House Bills 1051, 1381, 1529, 1714, 1760, 1816, 1825, and 1993--and four were enacted. Concurrently in the Senate, seven sex offender bills were introduced--i.e., Senate Bills 35, 109, 431, 490, 680, 877, and 891--and two were enacted. As background, sex offenders filed at least two federal lawsuits in 2006 seeking to prevent enforcement of SORA's residency restrictions against them--i.e., Doe v. Lane et al., No. 5:06-cv-00074-HE (W.D. Okla. filed Jan. 23, 2006), and Doe et al. v. Parish et al., No. 4:06-cv-00457-CVE-FHM (N.D. Okla. filed Sept. 1, 2006). Both lawsuits ended with settlements wherein the government officials agreed to refrain from enforcing the residency restrictions so long as the sex offenders remained at their current residences.

¶38 Under new leadership, the House GOP introduced its "Safe Families" initiative to "help restore . . . [a] sense of safety and demonstrate that as a state, we will keep working to reduce sexually violent crime."

¶39 Representative Terry Ingmire of Stillwater introduced H.B. 1381, which would expand electronic monitoring of certain types of offenders to cover all sex offenders.

¶40 Representative Al Lindley of Oklahoma City introduced H.B. 1529, which would implement a risk level assignment system for juvenile sex offenders.

¶41 Representative Paul Wesselhoft of Moore introduced H.B. 1714, which would allow a sentencing court to require registration of any sex offender's e-mail addresses and login credentials for messaging platforms and chat rooms and to restrict access to social networking websites that minor children utilize.

¶42 Representative Anastasia Pittman of Oklahoma City introduced H.B. 1993, which would expand the class of registered sex offenders to include those who were convicted of a qualifying crime prior to SORA's 1989 effective date and who were later convicted of any other crime in Oklahoma after SORA's 1989 effective date.

¶43 In H.B. 1825 Rep. Kiesel reintroduced his bill adding new sections to SORA that would require sex offenders to be assessed and assigned a risk level to determine what degree of community notification was needed.

¶44 That brings us to the last of the House Bills, Rep. Blackwell's H.B. 1760. As just mentioned, sections 23 through 29 of H.B. 1760 (as introduced) contained provisions identical to Representative Kiesel's 3-tiered risk level assignment system.

An Act relating to public safety; . . . amending [numerous provisions defining crimes in Titles 10 and 21 of the Oklahoma Statutes by] adding post-imprisonment supervision requirement for certain crimes; . . . clarifying zone of safety requirements; adding exception for persons receiving medical services at certain facilities; authorizing certain persons to attend religious services under specified circumstances; amending 22 O.S. 2001, Section 991a, . . . which relates to sentencing powers of the court; modifying supervision and probation provisions relating to sex offenders; amending 57 O.S. 2001, Section 582, . . . 583, . . . 584, . . . which relate to the Sex Offenders Registration Act; requiring determination of numeric risk level prior to release; directing certain information and numeric risk level be forwarded to certain entities; directing court to assign numeric risk level and provide certain notification; requiring verification of numeric risk level under certain circumstances; providing for establishment of risk assessment review committee; stating membership; stating function of committee; providing guidelines for selection of screening tool; providing for override of numeric risk level under certain circumstances; providing for the release of certain records and files; exempting risk assessment review committee meeting from certain act; clarifying registration requirements; increasing registration time periods; authorizing certain persons to petition the court for removal from registration requirements; requiring registration regardless of residency location; modifying address verification requirements; authorizing address verification by local law enforcement; requiring notification to local law enforcement of change in status; clarifying scope of liability; clarifying residency restriction requirements; providing an exception; providing exception to certain residency restriction for married persons and relatives . . . .

H.B. 1760's provisions were codified in Title 10 concerning "Children," in Title 21 concerning "Crimes & Punishments," and in Title 57 concerning "Prisons & Reformatories."

¶45 In the Senate, Sen. Crain of Tulsa reintroduced his bill to require new driver licenses bearing the words "Sex Offender" in S.B. 35.

An Act relating to motor vehicles; amending 47 O.S.2001, Section 6-105 . . . and 6-111, . . . which relate to issuance of driver license and identification cards; modifying qualifications for issuance of intermediate Class D licenses to certain persons; . . . directing the Department of Public Safety to issue distinctive driver license or identification card to persons required to register pursuant to the Sex Offenders Registration Act and who have been designated an aggravated or habitual offender; directing the Department to provide notification of certain requirements; requiring the surrender of driver license or identification care within a certain period of time; authorizing application for replacement driver license or identification card; providing for certain action by the Department for failure to comply; authorizing application for reissuance of certain driver license or identification card; providing penalty for certain act . . . .

S.B. 35's provisions were codified in Title 47 concerning "Motor Vehicles."

¶46 Sen. Nichols of Norman introduced S.B. 109, which would repeal the school-activities exception in the Penal Code's safety zone law that had been enacted the previous year.

An Act relating to sex offenders: amending . . . 21 O.S. Supp. 2006, Section 1125 . . . , which relates to safety zone; removing certain exception for certain person to be on school property; and declaring an emergency.

S.B. 109's provisions were codified in Title 21 concerning "Crimes & Punishments."

¶47 Closely related, Senator Charlie Laster of Shawnee introduced S.B. 490, which would require registered sex offenders attending their child's school activities to provide advance written notice to school administrators, allow administrators to assign a designee to accompany any sex offender while on school property, authorize administrators to deny attendance under certain conditions, and make violations of the new rule a felony. 
¶48 Sen. Nichols also introduced S.B. 431, which would prevent registered sex offenders from participating in holiday events involving minor children--including "such holidays as Halloween, Christmas, and Easter"--unless the event involves only their child(ren) and would make violations punishable as a misdemeanor. 
¶49 Senator Kenneth Corn of Poteau introduced S.B. 680, which would create a Sex Offender Management Team within the DOC to "develop[] effective policies and practices for supervision and treatment of sex offenders." 
¶50 Senator Debbe Leftwich of Oklahoma City introduced S.B. 877, which was merely intended to clean up language in Oklahoma's Juvenile SORA. 
¶51 Finally, Sen. Laster also introduced S.B. 891, which would have defined the terms "predator," "sexually violent predator," and "nonaggressive offender" for purposes of SORA. 
j. Relevant Amendments Since 2007 to SORA's Residency 
Restrictions and the Penal Code's Zones of Safety

¶52 Since 2007, the residency restrictions in § 590 of SORA and the zones of safety established in § 1125 of the Penal Code have only become more restrictive. In the following years, residency restrictions were expanded to include any "property or campsite used by an organization whose primary purpose is working with children"; any "playground or park that is established, operated or supported in whole or in part by a homeowners' association or a city, town, county, state, federal or tribal government"; any "family child care home as defined in the Oklahoma Child Care Facilities Licensing Act"; and "the residence of his or her victim" regardless of the victim's age. 
2. What This History Tells Us about Legislative Intent

¶53 Although the 1989 sex offender legislation may have been civil and regulatory, the amendments since then demonstrate a punitive intent in several ways.

¶54 First, the "findings" subsection added to section 581 of SORA in 1997 expresses a punitive intent. Therein, "[t]he Legislature f[ou]nd[] that sex offenders who commit other predatory acts against children and persons who prey on others as a result of mental illness pose a high risk of re-offending after release from custody."Starkey, both of these goals are traditional aims of punishment. Starkey, 2013 OK 43

¶55 Second, turning to something that the majority opinion omits, the 2003 and 2006 amendments concerning residency restrictions in section 590 of SORA were always passed in tandem with the safety zone laws in section 1125 of the Penal Code and with numerous other sex offender provisions that clearly demonstrate the Legislature's punitive intent. In 2003, H.B. 1501 enacted SORA's first residency restriction that prohibited sex offenders from living within 2,000 feet of any school, and S.B. 554 enacted the Penal Code's first "zone of safety" law that prohibited sex offenders who committed certain sex crimes against victims under the age of 13 from breaching a 300-foot safety zone around elementary and junior high schools.full context should lead everyone to conclude that the Legislature's intent was retributive and punitive.

¶56 Third, the majority's conclusion that SORA's residency restrictions "are part of the civil regulatory system intended to reduce recidivism and protect the public, specifically children" is questionable insofar as numerous exceptions to the restrictions have been made, both in the statutory provisions and in selective enforcement of the law. For instance, the current version of section 590 that the City of El Reno wishes to enforce against Mr. Donaldson purportedly restricts him from residing "within a two-thousand-foot radius of . . . a park that is established, operated or supported in whole or in part by a homeowner's association or a city, town, county, state, federal or tribal government, [or of] a licensed child care center or family child care home as defined in the Oklahoma Child Care Facilities Licensing Act." 57 O.S.Supp.2019, § 590Id. In other words, it would appear the Legislature cares about the safety of the public and, in particular, children unless the sex offender already lived there first. If the law was purely civil and regulatory, there wouldn't be any need for such an exemption; but the existence of the exemption seems to acknowledge the Legislature's belief that the residency restriction is punitive and that its retroactive application to a sex offender who lived in the neighborhood first might violate the constitutional prohibition of ex post facto laws. Moreover, sex offenders have filed at least two federal lawsuits seeking to prevent enforcement of SORA's residency restrictions against them--i.e., Doe v. Lane et al., No. 5:06-cv-00074-HE (W.D. Okla. filed Jan. 23, 2006), and Doe et al. v. Parish et al., No. 4:06-cv-00457-CVE-FHM (N.D. Okla. filed Sept. 1, 2006)--and both lawsuits ended with settlements wherein the government officials agreed to refrain from enforcing the residency restrictions so long as the sex offenders remained at their current residences.

¶57 For all these reasons, I believe the Oklahoma Legislature intended to make the residency restrictions in § 590 of SORA punitive.

B. Starkey Rejected the "Clearest Proof" Burden

¶58 Before proceeding to a discussion of the second prong of the "intent-effects" test, I must address the majority's adoption and application of the "clearest proof" burden to that second prong. Without discussion, the majority invokes the "clearest proof" burden with a quotation from Smith v. Doe, 538 U.S. 84, 92 (2003), and a citation that signals us to "see" Starkey at ¶ 77. See Majority Op. ¶ 19. As the majority notes, in that paragraph the Starkey Court "f[ou]nd there is clear proof that the effect of the retroactive application of SORA's registration is punitive and outweighs its non-punitive purpose." Id. ¶ 19 n.10 (citing Starkey, 2013 OK 43Starkey rejected the clearest proof standard and adopted an alternative standard set forth in Justice Ginsburg's dissent in Smith v. Doe" and that "the Starkey opinion does include some discussion of Justice Souter and Justice Ginsburg's dissatisfaction with the clearest proof standard." Id. Nevertheless, the majority chooses to ignore such information because of its determination that the Starkey Court's finding of clear proof is equivalent to application of the clearest proof burden. Id.

¶59 This is nothing more than a veiled attempt to overrule one aspect of the Starkey precedent that the majority dislikes and to revert back to the U.S. Supreme Court's higher burden of proof from Smith v. Doe that Starkey rejected. In ¶¶ 44 and 45 of the Starkey opinion, this Court adopted a less stringent burden of proof:

¶44 In Smith v. Doe, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), the Supreme Court found "that 'only the clearest proof' that a law is punitive based on substantial factors will be able to overcome the legislative categorization." In his concurring opinion, Justice Souter stated the standard of "clearest proof" made sense "only when the evidence of legislative intent clearly points in the civil direction." He believed there was considerable evidence that the act in Smith had criminal characterizations as well as civil. Justice Ginsburg also stated in her dissent that she would not demand "the clearest proof" be used to determine if a statute is in effect criminal rather than civil. In her opinion, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) guides one to use a neutral evaluation of the act's purpose and effects. As stated, there is no clear legislative categorization that SORA is a civil law. In Oklahoma, legislative enactments are presumed constitutional. Where feasible this Court will construe statutes in a manner to uphold their constitutionality. The constitutionality of a statute will be upheld unless it is clearly inconsistent with the constitution. The factors in the second part of the inquiry will help determine SORA's nature and provide a neutral framework for determining SORA's purpose and effects.

¶45 Smith dealt with an interpretation of the Federal Constitution's prohibition on ex post facto laws. Although Oklahoma's ex post facto clause is nearly identical to the Federal Constitution's provisions we are not limited in our interpretation of Oklahoma's constitution. How we apply the "intent-effects" test is not governed by how the federal courts have independently applied the same test under the United States Constitution as long as our interpretation is at least as protective as the federal interpretation. This Court has previously held:

The people of this state are governed by the Oklahoma Constitution, and when it grants a right or provides a principle of law or procedure beyond the protections supplied by the federal constitution, it is the final authority. This is so even if the state constitutional provision is similar to the federal constitution. The United States Constitution provides a floor of constitutional rights--state constitutions provide the ceiling.

Daffin v. State, 2011 OK 22251 P.3d 741Alva State Bank & Trust Co. v. Dayton, 1988 OK 44755 P.2d 635

Starkey, 2013 Ok 43Starkey did adopt a lower burden of proof to provide "a neutral framework for determining SORA's purpose and effects" because "there [wa]s no clear legislative characterization that SORA is a civil law" and that the reason for adopting a neutral framework was to provide ex post facto protections beyond those afforded by the federal constitution. Had SORA included a clear statement of legislative intent that it was not punitive, there would have been no reason to quote Justice Souter's concurrence or Justice Ginsburg's dissent. Similarly, had we adopted the clearest-proof burden, there would have been no need to discuss our State Constitution's ability to provide more protection at "the ceiling" than what the federal constitution provides at the "floor." In fact, everything after the first sentence in ¶ 44 of Starkey would have been superfluous unless we were adopting a lower, more "neutral" burden of proof.

¶60 The majority's attempt to confuse the matter by referencing Starkey's ultimate finding of "clear proof that the effect of the retroactive application of SORA's registration is punitive" is misguided. See Majority Op. ¶ 19 n.10 (quoting Starkey, 2013 OK 43Starkey subsequently found "clear proof" does not undermine our adoption of a neutral framework; it merely speaks to the one-sidedness of the evidence in Starkey. A finding of clear proof is not the same as a statement that clearest proof must be found or that the clearest-proof burden applies.

¶61 Moreover, the appealing parties concede that the Starkey Court did not adopt the clearest proof burden. In his brief, the Attorney General stated: "Importantly, the [U.S.] Supreme Court held 'that only the clearest proof that a law is punitive based on substantial factors will be able to overcome the legislative categorization' of the statute as civil. Smith, 538 U.S. at 92 (emphasis added). Instead of embracing the U.S. Supreme Court's standard, Starkey cited Justice Souter's concurring opinion and Justice Ginsburg's dissenting opinion from Smith that each disputed applying the 'clearest proof' approach . . . ." State's Br. 6. Similarly, the City of El Reno's attorney admitted at oral argument that "[t]he [Starkey] Court did not adopt the clearest proof standard that the U.S. Supreme Court adopted in Smith v. Doe" and that "under Starkey" we would "stick with the neutral evaluation standard" is certainly not authoritative. Okla. Sup. Ct. Oral Argument Case No. 120,617 at 15:50--:56, 1:18:16--:21, available at https://vimeo.com/ 908699917/c4ef035ab9?share=copy. Although their concessions are not authoritative, they do lend support to my reading of Starkey at the same time that they disparage the majority's reading.

¶62 For these reasons, I dissent to the majority's adoption and application of the "clearest proof" burden. I would apply the neutral burden of proof that this Court adopted in Starkey for determining whether the effects of the sex offender legislation at issue are punitive.

¶63 Before I move on, however, I would be remiss not to address the City of El Reno's arguments raised at oral argument that Starkey fails to explain how or why Oklahoma's ex post facto clause could provide greater protection than the nearly identical federal clause. See Majority Op. ¶ 21 n.11. My response is twofold. First, there is an explanation within Starkey's quotations from Justice Souter's concurrence and Justice Ginsburg's dissent to demonstrate that there is no real consensus on why the federal constitution should require clearest proof and thus provide less protection. Second, this argument is recycled from the Starkey dissents, see Starkey, 2013 OK 43Smith v. Doe majority and Justices Souter and Ginsburg and decided to go with a more robust ex post facto clause that didn't require "clearest proof." In other words, the Oklahoma Constitution provides more protection because six Justices on this Court said so. See generally Okla. Sup. Ct. Oral Argument Case No. 120,617 at 31:07--32:07 (wherein City's counsel said she wasn't sure Starkey's interpretation of Oklahoma's ex post facto clause as providing more protection than its federal counterpart was justified, and Justice Kauger responded: "Well, right now it is because we said so"), available at https://vimeo.com/908699917/c4ef035ab9?share=copy.

C. Punitive Effects

¶64 Finally, even if I assumed the Oklahoma Legislature's intent in enacting SORA's residency restrictions was civil in nature--much as Starkey did--I would ultimately strike down as unconstitutional the residency restrictions as applied retroactively to Mr. Donaldson due to their punitive effects. Looking at the majority's assessment of the seven Mendoza-Martinez factors, I only agree with their conclusions that the first factor "weighs in favor of a punitive effect" and that the third factor should be "given little weight." See Majority Op. ¶¶ 31, 35.

¶65 As a preliminary matter, I take issue with the majority's heavy reliance upon Smith v. Doe and several other federal appellate court cases decided since, and therefore constrained by the outcome in, Smith. See, e.g., Majority Op. ¶¶ 34, 36-- 39, 42 (citing Smith, 538 U.S. at 102--05; McGuire v. Marshall, 50 F.4th 986, 1008--09 (11th Cir. 2022); Shaw v. Patton, 823 F.3d 556, 566--68, 571, 574, 576--77 (10th Cir. 2016); Doe v. Miller, 405 F.3d 700, 720--22 (8th Cir. 2005); Hatton v. Bonner, 356 F.3d 955, 965 (9th Cir. 2004)). Such reliance is misplaced because the Starkey Court knew it was reaching a different conclusion than Smith. My majority opinion referenced Smith twenty-two times. Starkey, 2013 OK 43Smith was later undone when the Alaska Supreme Court found that Alaska's Sex Offender Registration Act did violate the Alaska Constitution's ex post facto clause. Id. ¶ 40, 305 P.3d at 1019 (taking issue with cases cited by the DOC because those cases did not mention Doe v. State, 189 P.3d 999 (Alaska 2008)). We then went through the seven Mendoza-Martinez factors, but we repeatedly found ourselves persuaded more by the concurrence and dissents in Smith, by the Alaska Supreme Court's Doe v. State opinion, and by other courts that disagreed with Smith. Id. ¶¶ 49, 55--56, 59--60, 65, 74--75, 305 P.3d at 1022, 1024--30 (citing Smith, 538 U.S. at 111 (Stevens, J., dissenting); Smith, 538 U.S. at 109 (Souter, J., concurring in judgment); Smith, 538 U.S. at 116--17 (Ginsburg, J., dissenting); Doe, 189 P.3d at 1012; Commonwealth v. Baker, 295 S.W.3d 437, 444 (Ky. 2009); Wallace v. State, 905 N.E.2d 371, 380 (Ind. 2009)). In a drive-by concurrence, Justice Gurich explicitly stated that "[t]he dissenters' reliance on Smith v. Doe, 538 U.S. 84 is misplaced because the Alaska registration system reviewed in that case did not have the constitutional infirmities present in this case." Id. ¶ 85, 305 P.3d at 1031 (Gurich, J., concurring). Justice Taylor's drive-by dissent cited Smith in support of his conclusion that SORA "is a civil, nonpunitive, noncriminal regulatory program that does not violate any ex post facto concerns when applied retroactively. Smith v. Doe, 538 U.S. 84." Id. ¶ 88, 305 P.3d at 1032 (Taylor, J., dissenting). And Justice Winchester's dissent was replete with references to Smith (thirty-six in the body of the writing), criticizing the majority in its opening paragraph because "[t]he majority opinion also conflicts with the opinion of the United States Supreme Court in Smith v. Doe . . . ." Id. ¶ 1, 305 P.3d at 1032 (Winchester, J., dissenting). We duly considered Smith's outcome, but a six-member majority decided to spurn a similar outcome with respect to SORA in light of Oklahoma's ex post facto clause.

¶66 Similarly, the majority utilizes opinions from lower federal courts to stack its deck in declaring that it is "join[ing] the majority of courts from other jurisdictions having assessed the constitutionality of similar residency restrictions." Majority Op. ¶ 44 n.18. The majority cites cases from four U.S. Courts of Appeals, one U.S. District Court, and four state appellate courts. See id. (citing McGuire, 50 F.3th 986 (Eleventh Circuit); Shaw, 823 F.3d at 577 (Tenth Circuit); Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1017 (8th Cir. 2006); Miller, 405 F.3d at 720 (also Eighth Circuit); Hatton, 356 F.3d at 965 (Ninth Circuit); Doe 1 v. City of Apple Valley, 487 F. SupP.3d 761, 774 (D. Minn. 2020); People v. Mosley, 344 P.3d 788, 804 (Cal. 2005); People v. Leroy, 828 N.E.2d 769. 782 (Ill. App. Ct. 2005); Standley v. Town of Woodfin, 650 S.E.2d 618, 622--23 (N.C. Ct. App. 2007), aff'd, 661 S.E.2d 728 (N.C. 2008); City of South Milwaukee v. Kester, 2013 WI App 50, ¶ 31, 830 N.W.2d 710, 721). The majority does acknowledge two state appellate courts in the minority. Id. (citing State v. Pollard, 908 N.E.2d 1145, 1152 (Ind. 2009); Baker, 295 S.W.3d at 444 (Kentucky)). The federal case law should be completely discounted, as Smith v. Doe controlled and compelled the outcomes in those cases. Moreover, even though the California Supreme Court found that residency restrictions didn't violate the ex post facto clause in the Mosley case, that court later found that "blanket enforcement of the mandatory residency restrictions of Jessica's Law, as applied to registered sex offenders on parole in San Diego County, . . . has imposed harsh and severe restrictions and disabilities on the affected parolees' liberty and privacy rights, however limited, while producing conditions that hamper, rather than foster, efforts to monitor, supervise, and rehabilitate these persons. Accordingly, it bears no rational relationship to advancing the state's legitimate goal of protecting children from sexual predators, and has infringed the affected parolees' basic constitutional [due process] right to be free of official action that is unreasonable arbitrary, and oppressive." In re Taylor, 343 P.3d 867, 879 (Cal. 2015). Thus, California's commitment to the majority's cause appears to be in question. That leaves three or four state appellate decisions in favor of today's majority versus two against--hardly enough of a sampling to constitute a meaningful "majority of courts from other jurisdictions."

¶67 With those preliminary matters out of the way, I will now address the second, fourth, fifth, sixth, and seventh Mendoza-Martinez factors.

1. Residency Restrictions Resemble Sanctions that 
Have Been Historically Considered Punishment.

¶68 Regarding the second factor--i.e., whether residency restrictions "ha[ve] historically been regarded as a punishment"--the majority's conclusion that "this factor does not support a punitive effect" should be precluded by Starkey. In Starkey, this Court specifically invoked the residency restrictions in its analysis of this second factor and reached the opposite conclusion:

In addition, SORA's residency restrictions are similar to the traditional punishment of banishment. . . . If a person owns a home within a prohibited area and becomes subject to SORA registration, they must vacate the property. The offender does not have to dispose of the property, however, the offender is prohibited from residing on the property (ostensibly allowing a registered offender the ability to be at the residence, but not "reside" on the property). In analyzing this Mendoza-Martinez factor, the Supreme Court of Kentucky determined a similar residency restriction was "regarded in our history and traditions as punishment." The court found the restriction expels registrants from their homes even if they resided there prior to the statute's enactment. The Oklahoma version of SORA is even more restrictive than the Kentucky law because the restrictive distance is twice as large as Kentucky's one-thousand-foot distance.

. . . The expulsion from one's residence is likewise analogous to the traditional punishment of banishment. Again, we are not making a determination of the constitutionality of any of these individual registration requirements but for purposes of analyzing the second Mendoza-Martinez factor we find the totality of these requirements weigh in favor of punishment.

Starkey, 2013 OK 43Baker, 295 S.W.3d at 444).

¶69 Nevertheless, today's majority takes a different path. First, it presents an ad hominem attack against Mr. Donaldson. See Majority Op. ¶ 33. Essentially, they discredit the notion that SORA's residency restrictions are analogous to banishment because Mr. Donaldson isn't being kicked out of a house in which he already lives but is trying to live in a house he purchased after police told him he couldn't live there. Second, the majority rejects the Baker case as unpersuasive because of its discussion of "expel[ling] registrants from their homes," which is not Mr. Donaldson's scenario. Majority Op. ¶ 33. Finally, the majority relies upon federal precedent defining "[t]he cornerstones of banishment" as "complete expulsion from a community" and "prohibiting offenders from even being present in the restricted area" coupled with their acceptance of the City of El Reno's assertion that "57 O.S., § 590Id. ¶ 34 (quoting Shaw, 823 F.3d at 566--68).

¶70 The majority's "deeper understanding of the historic punishment of banishment" in light of federal case law is incorrect. Shaw's first description of banishment as "complete expulsion from a community" is nothing new. Smith itself described banishment as "expel[ling] [a person] from the community," Smith, 538 U.S. at 98; and Starkey explicitly acknowledged Smith's description of banishment as "expulsion from the community," Starkey, 2013 OK 43Smith, 538 U.S. at 98). The Starkey Court knew what banishment was. It didn't need a "deeper understanding." Although the majority acknowledges in a later part of their opinion "that there are likely some sex offenders who are not in compliance with the current residency restrictions and will need to move," Majority Op. ¶ 45, the majority fails to appreciate that such sex offenders are being "expel[led] . . . from their homes," Starkey, 2013 OK 43Shaw's second description leads the majority to endorse the City of El Reno's point that the residency restrictions in "§ 590(A) [of SORA] do[] not prohibit Donaldson from recreating or accessing the facilities at Lake El Reno." Majority Op. ¶ 34 (referencing City's Br. 14). While it may be true that § 590(A) of SORA doesn't restrict him in this manner, the safety zone laws in § 1125 of the Penal Code do. I brought this up at oral argument. Okla. Sup. Ct. Oral Argument Case No. 120,617 at 8:40--9:51, available at https://vimeo.com/908699917/c4ef035ab9? share=copy. Nevertheless, the majority continues to ignore the import of the safety zone laws in § 1125 that were enacted in conjunction with SORA's residency restrictions. See supra ¶ 55. Under § 1125, as currently drafted, Mr. Donaldson is forbidden from "entering any park" and from "loitering within five hundred (500) feet of any . . . park." To the extent Lake El Reno may be a park,Shaw's second definition for banishment. Thus, the majority's reliance upon Shaw to conclude that this second Mendoza-Martinez factor does not support a punitive effect is erroneous.

¶71 Beyond that, however, the majority and the federal cases upon which they rely ignore the unspoken motivation behind residency restrictions and safety zone laws, which is to force sex offenders out of town.See supra ¶¶ 55, 62--63, 67 (discussing the enactment of bills that restricted sex offenders from working at daycare facilities, at schools, at nursing homes, and as law enforcement officers). That motivation becomes crystal clear considering the fact that legislators have made Mr. Donaldson's sex offender status the predicate for new crimes. Residing near a park is only a crime for sex offenders like Mr. Donaldson, and any violation of that law can result in his complete removal from society for one to three years upon the first violation and for no less than three years upon a subsequent violation. 57 O.S.Supp.2019, § 590

¶72 The main disagreement between today's majority and the Starkey Court arises primarily from a difference in opinion over whether SORA must be identical to historical punishments or whether it must merely resemble them or be similar to them. Therein lies a major problem with characterizing sex offender registration laws in terms of "historical punishment," as such laws "are of fairly recent origin." Smith, 538 U.S. at 97 (quoting Doe I, 259 F.3d at 989). That is why we cannot look for an exact match. In Starkey, a six-member majority deliberately decided to spurn Smith's analysis of this factor in favor of more persuasive reasoning they found in the Alaska Supreme Court's Doe v. State opinion and in the Kentucky Supreme Court's Baker case. See Starkey, 2013 OK 43Smith, 538 U.S. at 97--98; Doe, 189 P.3d at 1012; Baker, 295 S.W.3d at 444). The majority would obviously prefer to sideline Starkey's conclusion that the residency restrictions help demonstrate SORA's punitive effects, as it seems like binding precedent in Mr. Donaldson's case. Nothing about SORA's residency restrictions has gotten less restrictive since Starkey; rather, the restrictions have only gotten worse. See supra notes 187--191 and accompanying text.

¶73 For all the reasons already discussed, I believe this second Mendoza-Martinez factor weighs in favor of characterizing SORA's residency restrictions as punitive in effect.

2. Residency Restrictions Promote the 
Traditional Aims of Punishment.

¶74 Regarding the fourth factor, the majority's determination that residency restrictions don't promote the traditional aims of retribution and deterrence is a foregone conclusion based upon their errant adoption of the "clearest proof" burden and mistaken determination that the legislative intent was non-punitive. See Majority Op. ¶ 37 ("[P]rohibiting sex offenders from living within 2,000 feet of certain locations where children are often present is not an expression of condemnation that is sufficiently clear or strong enough to negate the legislature's non-punitive intent."). The majority apparently agrees with Starkey's finding that, while "SORA promotes deterrence through threat of negative consequences, such as eviction and living restrictions," such determination "does not in and of itself impose a punishment." Id. ¶ 36 (citing Starkey, 2013 OK 43Smith and several other federal appellate court cases decided since Smith (and therefore falling in line with it) that discuss how a civil, regulatory law's indirect promotion of deterrence does not weigh strongly in favor of a punitive effect. Id. (citing Smith, 538 U.S. at 102; Shaw, 823 F.3d at 571; Miller, 405 F.3d at 720; Hatton, 356 F.3d at 965). The majority concludes that "any deterrent purpose is merely incidental" because "the purpose of the residency restrictions is not so much to deter the commission of the original sex offense that triggered SORA as it is to deter or, more accurately, prevent the sex offender from committing another sex offense in the future." Id. With confidence, the majority asserts that "[i]t is the threat of being imprisoned (if caught and convicted) that is intended to deter the original sex crime--not restrictions on where you can live after being released." Id.

¶75 I disagree with most of the majority's reasoning on deterrence. A six-member majority in Starkey deliberately rejected Smith's analysis of this factor in favor of more persuasive reasoning they found in Justice Souter's concurrence and in the Kentucky Supreme Court's case. See Starkey, 2013 OK 43Smith, 538 U.S. at 108--09 (Souter, J., concurring in judgment); Baker, 295 S.W.3d at 444; citing Smith, 538 U.S. at 102). The majority's reliance upon Smith and Smith's reliance upon Hudson v. United States, 522 U.S. 93, 99 (1997), seems misplaced. Hudson is a double jeopardy case. Both double jeopardy jurisprudence and ex post facto jurisprudence utilize the intent-effects test and the Mendoza-Martinez factors. But the idea of incidental deterrence seems to have more force and effect in double jeopardy cases where an individual who was not a criminal was deterred from conduct because such conduct could simultaneously result in both regulatory discipline and criminal prosecution. Thus, the criminal statutes deter the individual from committing certain criminal conduct, and the civil regulations "incidentally" deter the individual from committing the same conduct. That doesn't render the civil regulations punitive such that a person who has been disciplined pursuant to the civil regulations can later avoid criminal prosecution under the constitutional right against double jeopardy. The logic of this double jeopardy scenario doesn't carry over, however, when we try to apply it in Mr. Donaldson's ex post facto case. That's because we now have two criminal statutes in play and one so-called "civil regulation." The first criminal statute is the one forbidding the sex offense, which was first-degree rape in Mr. Donaldson's case. The so-called "civil regulation"--which is the residency restriction in Mr. Donaldson's case--doesn't come into play until after he becomes a convicted sex offender and completes his sentence (including probation) under the first criminal statute. Thus, in one sense there's no way the "civil, regulatory" residency restriction can deter commission of the original sex offense because the residency restriction doesn't even apply until after the commission of the original sex offense. That makes this ex post facto case completely different from a double jeopardy case. But in another sense, the majority shouldn't be so confident in asserting that "the purpose of the residency restrictions . . . is to deter or, more accurately, prevent the sex offender from committing another sex offense in the future," Majority Op. ¶ 36, because some legislators apparently intend for the residency restrictions to deter the original crime. See Coppernoll et al., supra note 212, at 1A (wherein an Oklahoma legislator suggests that residency restrictions should be a deterrent for the original crime: "'My heart bleeds for them very little,' said state Rep. Randy Terrill, R-Moore. Terrill is a co-sponsor of several bills that included the residency restriction. 'The solution is real simple . . . don't commit the crime.'" (ellipsis in original)). The logic breaks down yet again because a second criminal statute comes into play--i.e., the statute making it a crime for him to violate the residency restrictions--at the same time the civil, regulatory rule comes into play. That's because the second criminal statute and the civil, regulatory rule are contained in the very same statute. See 57 O.S.Supp.2019, § 590id. § 590(D) (making "[a]ny person willfully violating the provision of this section by: 1. [i]ntentionally moving into any neighborhood or to any real estate or home within the prohibited distance . . . guilty of a felony"). In the Hudson double-jeopardy case, the civil regulations weren't contained in the same title as the criminal statute. If the sex offender violates the new "civil, regulatory" rules governing where he can live, work, or "loiter," he can be prosecuted for committing a new felony crime that's not related to the original sex offense or another sex offense. The logic just falls apart. Moreover, unlike the average citizen, the sex offender can be prosecuted for working where he shouldn't have worked, living where he shouldn't have lived, or lingering where he shouldn't have lingered. I wouldn't characterize this sort of deterrence as "merely incidental."

¶76 At this juncture, it should be apparent that the residency restrictions' creation of new crimes for sex offenders only tends to demonstrate a retributive effect. As in Starkey, I am still persuaded by Justice Souter's concurrence in Smith:

Ensuring public safety is, of course, a fundamental regulatory goal, and this objective should be given serious weight in the analyses. But at the same time, it would be naïve to look no further, given the pervasive attitudes toward sex offenders. The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.

Smith, 538 U.S. at 108--09 (Souter, J., concurring in judgment) (citations omitted) (emphasis added). The 2003 and 2006 amendments concerning residency restrictions in § 590 of SORA were always passed in tandem with the safety zone laws in § 1125 of the Penal Code, and they always carried a criminal sanction for violations. See supra ¶ 55. Add to that the other sex offender legislation from 2005 to 2007, and one gets the sense that Oklahoma legislators were out to score political points by enacting laws that would punish sex offenders. Id.

¶77 Suffice it to say, SORA's residency restrictions promote both deterrence and retribution, which are traditional aims of punishment; and this fourth Mendoza-Martinez factor weighs in favor of characterizing the residency restrictions as punitive in effect.

3. Residency Restrictions Are Only Applied to Behavior that Is Already a Crime.

¶78 With regard to the fifth factor, the majority recognizes Starkey's determination that "SORA applies only to behavior that is already a crime" such that "this Mendoza-Martinez factor has a punitive effect," yet they conclude "this factor should be given little weight." Majority Op. ¶ 36 (quoting Starkey, 2013 OK 43Smith v. Doe for the proposition that the "past conduct, which was, and is, a crime . . . is a necessary beginning point [for the regulatory scheme], for recidivism is the statutory concern." Id. (quoting Smith, 538 U.S. at 105). The majority then cites an Iowa Supreme Court case in support of their conclusion that, "while this factor weighs in favor of finding the scheme punitive, it does so only slightly." Id. (quoting In re Interest of T.H., 913 N.W.2d 578, 594 (Iowa 2018)).

¶79 Regarding the majority's assertion that recidivism is the statutory concern, I doubt that. "[I]f recidivism were the only concern, the statute would apply not only to convicted sex offenders, but also to other defendants who might pose a threat to society even if they are not convicted," such as sex offenders "charged with sex offenses but found incompetent to stand trial, [those] found not guilty by reason of insanity, and those committed to mental health facilities as sexual psychopaths." Wallace, 905 N.E.2d at 382 (citing Doe, 189 P.3d at 1014). But the risk level assignments at issue in Starkey apply only to convicted sex offenders. It is the determination of guilt for one of these sex offenses that triggers the registration requirement and residency restrictions, not merely the fact of the conduct or the potential for recidivism. See Letalien, 985 A.2d at 22 ("Because registration under SORNA of 1999 only applies to offenders who were convicted of specified crimes, does not arise based on individualized assessment of an offender's risk of recidivism, and cannot be waived based on proof that an offender poses little or no risk, SORNA of 1999 applies exclusively to behavior that is already a crime."). Because the criminal conviction itself triggers application of the residency restrictions, such restrictions appear to be further retribution based on the original criminal conduct. Smith, 538 U.S. at 109 (Souter, J., concurring in judgment).

¶80 Thus, the residency restrictions apply exclusively to behavior that is already a crime for purposes of retribution, and this factor should weigh heavily in favor of characterizing them as punitive in effect.

4. Residency Restrictions Have No Rational 
Connection to a Non-Punitive Purpose.

¶81 With regard to the sixth Mendoza-Martinez factor, the majority seems comfortable concluding that "the residency restrictions have a rational connection to the provision's non-punitive objectives of protecting the public and reducing recidivism," pointing to Mr. Donaldson's concession on this point and Starkey's previous conclusion that this factor weighs in favor of characterizing SORA's registration requirements as non-punitive in effect. Majority Op. ¶ 39 (quoting Starkey, 2013 OK 43Smith v. Doe's characterization of this factor as "a most significant factor" even though Mendoza-Martinez itself emphasized that "no one factor should be considered controlling." Hudson, 522 U.S. at 101 (citing Mendoza-Martinez, 372 U.S. at 169).

¶82 For reasons I previously discussed, however, I question whether the residency restrictions are rationally connected to the purported nonpunitive goals of public safety or the prevention of recidivism. In Commonwealth v. Baker, 295 S.W.3d 437 (Ky. 2009), the Kentucky Supreme Court concluded that the sex offender statute "d[id] not have a rational connection to a nonpunitive purpose." Id. at 445--46. I think the same could be said for Oklahoma's residency restrictions and safety zone laws.

¶83 Numerous exceptions to the restrictions exist, both in the statutory provisions and in selective enforcement of the law. If protecting the public was the real goal, then the Legislature wouldn't make exceptions to the residency restrictions that "grandfather in" any sex offenders living in proximity to a park or playground, and law enforcement agencies wouldn't be creating exceptions for the enforcement of residency restrictions in their lawsuit settlements. See supra ¶ 56.

¶84 Additionally, there is a growing sentiment that suggests residency restrictions put the public in more danger because they encourage sex offenders to live off the grid. See Coppernoll et al., supra note 212, at 1A ("Some say the law may put Oklahoma's children in more danger. . . . Instead of leaving city limits, many offenders will simply fall off the registry, said [police Sgt. John] Adams, who heads the child exploitation unit for the Tulsa police. That appears to be happening already. Adams said 40 sex offenders dropped off Tulsa's registry in the first month the new [residency restriction] law was in effect."); Mock & Dean, supra note 159, at 6A ("Police and corrections officials who track offenders said the residency restrictions, tightened last year, are driving more offenders off the registry list, making it difficult to track them and increasing the likelihood they will reoffend."). If the real concern was recidivism, then the Legislature would have targeted only those convicted sex offenders who pose the greatest risk of recidivism, only those convicted sex offenders whose crimes involved children that can be found at the restricted playgrounds and parks, or--on the flip side--everyone whose underlying conduct constitutes a sex offense and not just those convicted of a sex offense. See Wallace, 905 N.E.2d at 382.

¶85 There is also a growing body of research indicating that residency restrictions actually increase the risk of recidivism. See People ex rel. T.B., 2021 CO 59, ¶ 57, 489 P.3d 752, 768 (citing Molly J. Walker Wilson, The Expansion of Criminal Registries and the Illusion of Control, 73 La. L. Rev. 509, 523 & n.93 (2013)); People v. Betts, 968 N.W.2d 497, 514 (Mich. 2021) (citing Mariel Alper & Matthew R. Durose, Bureau of Justice Statistics, U.S. Dep't of Justice, Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005--2014) (May 2019), available at https://www.bjs.ojp.gov/content/pub/pdf/ rsorsp9yfu0514.pdf; Beth Huebner et al., An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri (July 1, 2013), available at https:// www.ojp.gov/pdffiles1/nij/grants/242952.pdf; J.J. Prescott & Jonah E. Rockoff, Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?, 54 J.L. & Econ. 161 (2011)); State v. Hinman, 530 P.3d 1271, 1278 (Mont. 2023); see also Coppernoll et al., supra note 212, at 1A ("'There is no doubt in my mind that what the legislators have done has put the community at risk,' said Mark Pursley, a parole officer who supervises sex offenders. 'Residential restrictions actually increase recidivism.' Pursley said his research shows that removing sex offenders from the conveniences of urban areas--housing, jobs, treatment, and public transportation--makes them more likely to reoffend."); Mock & Dean, supra note 159, at 6A.

¶86 With no rational connection to the purported nonpunitive purposes of public safety and the prevention of recidivism, this sixth Mendoza-Martinez factor weighs in favor of characterizing the residency restrictions as punitive in effect.

5. Residency Restrictions Are Excessive with Respect 
to the Proffered Non-Punitive Purposes.

¶87 Concerning the last Mendoza-Martinez factor, the majority prefers to give deference to the Oklahoma Legislature's "policy decision that all persons convicted of the sexual offenses enumerated in 57 O.S., § 582Smith v. Doe, other federal case law, and one California case that would permit such an overbroad rule. Majority Op. ¶ 42 (quoting Smith, 538 U.S. at 103--04; People v. Mosley, 344 P.3d 788, 804 (Cal. 2015); citing Shaw, 823 F.3d at 576--77; Miller, 405 P.3d at 721--22).

¶88 In Starkey, a six-member majority of this Court made the deliberate decision to reject Smith's analysis of this seventh factor and to adopt reasoning they found more persuasive that appeared in Justice Ginsburg's dissent in Smith and in the Alaska Supreme Court's case that effectively undid Smith. See Starkey, 2013 OK 43Smith, 538 U.S. at 105; Smith, 538 U.S. at 116--17 (Ginsburg, J., dissenting); Doe, 189 P.3d at 1016).

¶89 Furthermore, it should be plain that the residency restrictions are excessive--particularly with respect to the illegitimate nonpunitive purposes proffered by the City of El Reno, see supra ¶¶ 81--86 (discussing how there is no rational connection to the stated goals of public safety and reduced recidivism). Section 590 of SORA does not make any type of individualized assessment as to whether a particular offender is a threat to public safety.57 O.S.Supp.2019, §§ 583Mendoza-Martinez factor also weighs in favor of characterizing the residency restrictions as punitive in effect.

6. The Mendoza-Martinez Factors Show the 
Residency Restrictions Are Punitive in Effect.

¶90 Looking at my review of the Mendoza-Martinez factors under the neutral framework adopted by Starkey, six factors favor a finding that the residency restrictions are punitive in effect, and the seventh should be given little weight. The residency restrictions don't bear any rational connection to the nonpunitive purpose proffered by the majority and the City of El Reno. Therefore, the residency restrictions are extremely excessive in view of those nonpunitive purposes. Moreover, the residency restrictions impose an affirmative disability and restraint upon sex offenders, bear a strong resemblance to the historical punishment of banishment, only apply to conduct that is already criminal, and further the traditional aims of punishment. Although clear proof isn't necessary, there seems to be clear proof here that the effects of retroactively applying SORA's residency restrictions are punitive and would outweigh any nonpunitive purposes.

D. Conclusion

¶91 This dissent is not intended to be a defense of Mr. Donaldson, whose past crimes are reprehensible, or of sex offenders at large. Instead, my aim is to see the ex post facto prohibition in the Oklahoma Constitution upheld and enforced. Sex offenders should be punished in accordance with the law in effect at the time their sex offense was committed, and their registration requirements should be set using the law in effect at the time of their conviction. Thereafter, the government shouldn't be allowed to repeatedly move the goalposts through amendments to the laws defining punishments and registration requirements. Said another way, you can throw the book at them as it existed at the time of their offense, but you can't keep adding chapters or trying to change the ending. They would still be a registered sex offender.

¶92 Oklahoma's ex post facto clause forbids the Legislature from "retroactively alter[ing] the definition of crimes or increas[ing] the punishment for criminal acts." Starkey, 2013 OK 43Collins v. Youngblood, 497 U.S. 37, 43 (1990)). Through this prohibition the framers of our state constitution, like their federal counterparts, "sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Weaver v. Graham, 450 U.S. 24, 28--29 (1981); see also The Federalist No. 44, at 282 (James Madison) (stating that "ex post facto laws . . . are contrary to the first principles of the social compact and to every principle of sound Legislation"); The Federalist No. 84, at 511--12 (Alexander Hamilton) (observing that "the prohibition of ex post facto laws, and TITLES OF NOBILITY . . . are perhaps greater securities to liberty and republicanism than any it [i.e., the Constitution] contains. The creation of crimes after the commission of the fact, or in other words, the subjecting of men to punishment for things which, when they were done, were breaches of no law, and the practice of arbitrary imprisonments have been in all ages the favorite and most formidable instruments of tyranny"). Sex offenders are entitled to fair warning, the same as anyone else.

¶93 The City of El Reno's retroactive application of the residency restrictions to Mr. Donaldson is inconsistent with the ex post facto clause in the Oklahoma Constitution. I agree with the result of the trial court's summary judgment, which found the residency restrictions in the current version of § 590 of SORA should not be retroactively applied to Mr. Donaldson. This Court should apply the date-of-conviction rule adopted in Cerniglia v. Oklahoma Department of Corrections, 2013 OK 81349 P.3d 54257 O.S.Supp.2004, § 590

¶94 For all these reasons, I respectfully dissent.

FOOTNOTES

Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168--69 (1963). See Majority Op. ¶ 15.

See Act of Sept. 7, 1967, No. 507, §§ 1--4, 1967 Ala. Laws 1222, 1222--24 (codified at Ala. Code §§ 13-10-20 to 13-10-23 (1975)); Act of Mar. 28, 1951, ch. 105, § 1, 1951 Ariz. Sess. Laws 252, 252--53 (codified at Ariz. Code 1939 § 43-6117 (Supp. 1951)); Habitual Child Sex Offender Registration Act, Act 587, 1987 Ark. Acts 1286 (codified at Ark. Code Ann. §§ 12-12-091 et seq. (1987)); Act of July 7, 1947, ch. 1124, § 1, 1947 Cal. Stat. 2562, 2562--63 (codified at Cal. Penal Code § 290 (Deering 1949)); Habitual Child Sex Offender Registration Act, Pub. Act 84-1279, 1986 Ill. Laws 1467 (codified at Ill. Rev. Stat. 1987 ch. 38, pars. 221--230); Sexual Offender Registration Act, ch. 293, 1989 Mont. Laws 631 (codified at Mont. Code Ann. §§ 46-23-501 to 46-23-507 (1989)); Act of Mar. 24, 1961, ch. 147, 1961 Nev. Stat. 197, 197--98 (codified at Nev. Rev. Stat. §§ 207.151--207.157); Act of July 5, 1963, 130 Ohio Laws 669 (codified at Ohio Rev. Code §§ 2950.01 et seq.); Act of Mar. 30, 1983, ch. 88, § 42, 1983 Utah Laws 403, 427--29 (codified at Utah Code Ann. 1953 § 77-27-21.5 (Supp. 1983)).

Id. § 1, 1989 Okla. Sess. Laws at 556 (codified at 57 O.S.Supp.1989, § 581

Id. § 2, 1989 Okla. Sess. Laws at 556 (codified at 57 O.S.Supp.1989, § 58221 O.S.1981, § 88521 O.S.Supp.1989, § 88821 O.S.Supp.1989, §§ 1021

Id. § 4, 1989 Okla. Sess. Laws at 557 (codified at 57 O.S.Supp.1989, § 584).

Id. § 5, 1989 Okla. Sess. Laws at 557--58 (codified at 57 O.S.Supp.1989, § 585).

Id. § 6, 1989 Okla. Sess. Laws at 558 (codified at 57 O.S.Supp.1989, § 586).

Id. § 7, 1989 Okla. Sess. Laws at 558 (codified at 57 O.S.Supp.1989, § 587).

Id. § 8, 1989 Okla. Sess. Laws at 558--59 (codified at 51 O.S.Supp.1989, § 24A.8).

House Endorses Sex Offender Treatment Plan, Oklahoman, Feb 3, 1989, at 7, available at https://www.oklahoman.com/story/news/1989/02/03/house-endorses-sex-offender-treatment-plan/62625027007/; see also Letter from Jerry G. Johnson, Deputy Dir., Okla. Dep't Corr., to Rep. Jeff Hamilton, Okla. H.R. (Aug. 26, 1988) (attaching an "Interim Study on Therapeutic Programs for Convicted Sex Offenders" and "A Proposal for a Sex Offender Treatment Program" with numerous appendices that discussed programs implemented in Oregon, Missouri, New Jersey, Washington, Florida, Minnesota, and Connecticut); Anthony Thornton, State Proposal Targets Sex Offenders: 150-Bed Treatment Unit Suggested, Oklahoman, Dec. 26, 1988, at 11 (discussing the Oregon treatment program developed by Robert Freeman-Longo, who reportedly consulted with the Oklahoma DOC), available at https://www.oklahoman.com/story/news/1988/12/26/state-proposal-targets-sex-offenders-150-bed-treatment-unit-suggested/626289440 07/.

See H.J.R. 1004, 42d Leg., 1st Reg. Sess. (Okla. 1989); see also John Greiner, Treatment Plan Approved, Oklahoman, Apr. 25, 1989, at 25, available at https://www.oklahoman.com/story/news/1989/04/25/treatment-plan-approved/626 15967007/ .

New Treatment Offered Sex Offenders, Tulsa World, Sept. 1, 1989, https://tulsaworld.com/archive/new-treatment-offered-sex-offenders/article_ a88a415a-f4a2-5b10-a871-ce48fa6e37c5.html; Prison Official Has Doubts About Aversion Therapy, Oklahoman, Sept. 2, 1989, at 31, available at https:// www.oklahoman.com/story/news/1989/09/02/prison-official-has-doubts-about-aversion-therapy/62602691007/.

See Don Mecoy, Prison No Deterrent, Official Says, Oklahoman, Oct. 29, 1989, at 2 ("No sexual offender treatment has been available in Oklahoma's prisons before this program, which will begin Wednesday [i.e., November 1st]."), available at https://www.oklahoman.com/story/news/1989/10/29/prison-no-deterrent-official-says-treatment-program-targets-prevention-not-punishment/62592272007/.

Id. § 170101(f)(2)(A), 108 Stat. at 2042 (codified at § 14071(f)(2)(A) (repealed effective 2009)) ("A State that fails to implement the program as described in this section shall not receive 10 percent of the funds that would otherwise be allocated to the State under section 506 of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3765)."); see also Starkey, 2013 OK 43

See § 170101(a)(1)(A), (b)(1)--(2), 108 Stat. at 2038--40 (codified at § 14071(a)(1)(A), (b)(1)--(2) (repealed effective 2009)) (directing the U.S. Attorney General to "establish guidelines for State programs that require--(A) a person who is convicted of a criminal offense against a victim who is a minor or who is convicted of a sexually violent offense to register a current address with a designated State law enforcement agency" and imposing a duty upon State prison officers and sentencing courts to collect certain information about such offenders and to "forward it to a designated State law enforcement agency" responsible for entering the information into a registry (emphasis added)).

Id. § 5, 1995 Okla. Sess. Laws at 488 (codified at 57 O.S.Supp.1995, § 584(E)).

Senate Restores Funds Request for Veterans, Oklahoman, Apr. 26, 1995, at 14, available at https://www.oklahoman.com/story/news/1995/04/26/ senate-restores-funds-request-for-veterans/62392885007/.

further amended by Act of May 23, 1995, ch. 222, § 1, 1995 Okla. Sess. Laws 876, 877.

Vigil for Slain Girl, 7, Backs a Law on Offenders, New York Times, Aug. 3, 1994, at B4, available at https://www.nytimes.com/1994/08/03/nyregion/ vigil-for-slain-girl-7-backs-a-law-on-offenders.html.

Stranger on the Block--A Special Report: At Center of 'Megan's Law' Case, a Man No One Could Reach, New York Times, May 28, 1996, at A1, available at https://www.nytimes.com/1996/05/28/nyregion/stranger-block-special-report-center-megan-s-law-case-man-no-one-could-reach.html; Andy Newman, Megan, Her Law and What It Spawned, New York Times, Feb. 25, 1996, at 13, available at https://www.nytimes.com/1996/02/25/nyregion/megan-her-law-and-what-it-spawned.html.

Compare Megan's Law, Pub. L. No. 104-145, § 2, 110 Stat. 1345, 1345 (1996) (codified at 42 U.S.C. § 14071(d) (Supp. 1996) (repealed effective 2009)), with Wetterling Act, supra note 20, § 170101(d), 108 Stat. at 2041--42.

Id. § 2, 1997 Okla. Sess. Laws at 1422 (codified at 57 O.S.Supp.1997, § 581(B)).

Id. § 5, 1997 Okla. Sess. Laws at 1425 (codified at 57 O.S.Supp.1997, § 584(E)).

Id. § 5, 1997 Okla. Sess. Laws at 1425--26 (codified at 57 O.S.Supp.1997, § 584(H)).

House OKs Sex Offender Bill: Police Would Warn Citizens of 'Predators', Oklahoman, May 21, 1997, at 28, available at https:// www.oklahoman.com/story/news/1997/05/21/house-oks-sex-offender-bill-police-would-warn-citizens-of-predators/62313631007/.

et seq.; (l) kidnapping a child in violation of 21 O.S.Supp.1997, § 891; (m) using a computer to instigate sexual contact with a minor in violation of 21 O.S.Supp.1997, § 1040.13a; (n) buying, selling, bartering, trafficking in, or delivering a depiction of persons or animals in an act of sexual intercourse in violation of 21 O.S.Supp.1997, § 1040.51 (repealed 2000); and (o) rape by instrumentation in violation of 21 O.S.1991, § 1111.1. The crimes of (k) trafficking a child and (l) kidnapping a child do not require proof of any element that a sexual act was committed, attempted, or even intended.

 § 4, 1997 Okla. Sess. Laws at 1423 (codified at 57 O.S.Supp.1997, § 583).

Id. § 5, 1997 Okla. Sess. Laws at 1425 (codified at 57 O.S.Supp.1997, § 584(D)).

Id. (codified at 57 O.S.Supp.1997, § 584(A)(5)).

Id. § 7, 1997 Okla. Sess. Laws at 1427 (codified at 57 O.S.Supp.1997, § 587).

Id. § 1, 1997 Okla. Sess. Laws at 1421--22 (codified at 10 O.S.Supp.1997, § 404.1), further amended by Act of June 10, 1997, ch. 389, § 20, 1997 Okla. Sess. Laws 2404, 2430--32.

Id. § 1, 1997 Okla. Sess. Laws at 2359 (codified at 10 O.S.Supp.1997, § 21.1(E)).

Id. § 2, 1998 Okla. Sess. Laws at 1455 (codified at 57 O.S.Supp.1998, § 584(A)(5)).

Id.

Id. §§ 1--3, 1998 Okla. Sess. Laws at 2021--23 (codified at 70 O.S.Supp.1998, §§ 6-101.15, 6-101.22, 6-101.41).

Keating Considers Fate of Sex Offender Bill, Oklahoman, June 5, 2002, at 3-A, available at https://www.oklahoman.com/story/news/2002/06/05/keating-considers-fate-of-sex-offender-bill/62092241007/; Chuck Ervin, Castration Bill: Governor Vetoes Measure, Tulsa World, June 6, 2002, at 1, available at https://tulsaworld.com/archive/castration-bill-governor-vetoes-measure/article_c15 846c6-83f1-56cf-831a-67067c68f444.html; see also Press Release, Okla. Senate, Sen. Shurden Calls Governors [sic] Veto of Castration Bill Dishonest (June 5, 2002), available at https://oksenate.gov/press-releases/sen-shurden-calls-governors-veto-castration-bill-dishonest.

Sex Offender Says Not to Worry, Oklahoman, Oct. 24, 2002, at III-1 to III-2, available at https://www.oklahoman.com/story/news/2002/10/24/sex-offender-says-not-to-worry/62074238007/.

Id. at III-1.

Sex Offenders Barred from Living Near Schools, Oklahoman, May 22, 2003, at 4-A, available at https://www.oklahoman.com/story/ news/2003/05/22/sex-offenders-barred-from-living-near-schools/62042569007/.

Capitol Week: House Bill Addresses Seminude Salons, Oklahoman, Mar. 2, 2003, at A6, available at https:// www.oklahoman.com/story/news/2003/03/02/house-bill-addresses-seminude-salons/62055256007/.

Id.

Id. § 1, 2003 Okla. Sess. Laws at 949. Later amendments in 2007 to the residency restrictions would create exceptions for residences that were established prior to the creation of a park or daycare center, specifically stating that the creation of a park or daycare center "w[ould] not require the relocation of the sex offender," see infra notes 139--140, 164 and accompanying text--unambiguous verbiage that is lacking in the 2003 exception.

Id.

Id. § 1, 2003 Okla. Sess. Laws at 868.

Id. § 1, 2003 Okla. Sess. Laws at 867.

Id. § 1, 2004 Okla. Sess. Laws at 738 (codified at 57 O.S.2004, § 583(A)(1)). This seeming contradiction between when the obligation to register begins and when the ten-year period for registration begins still exists in the current version of SORA. Compare 57 O.S.2021, § 583(A)(1), with id. § 583(C)--(D), (G).

So Near Home, Body Found, Tampa Bay Times, Mar. 20, 2005, at 1, available at https://www.tampabay.com/archive/2005/03/20/so-near-home-body-found/.

Id. §§ 2--3, 2005 Okla. Sess. Laws at 888, 891 (codified at 22 O.S.Supp.2005, § 991a(A)(13) and 57 O.S.Supp.2005, § 510.10(C)). These requirements for electronic monitoring still exist under current law. See 22 O.S.Supp.2023, § 991a(A)(13); 57 O.S.2021, § 510.10(C).

See Susan Parrott & John Sutter, Care Centers House Sex Offenders, Oklahoman, July 12, 2004, at 1A, available at https://www.oklahoman.com/story/news/2004/07/ 12/care-centers-house-sex-offenders/61982447007/; Wes Bledsoe, Opinion, Violence in Nursing Homes, Oklahoman, Feb. 9, 2005, at 15A, available at https:// www.oklahoman.com/story/news/2005/02/09/violence-in-nursing-homes/6195562 2007/.

Id. § 1, 2005 Okla. Sess. Laws at 2107 (codified at 63 O.S.Supp.2005, § 1-1909(4)).

Id. §§ 2--6, 2005 Okla. Sess. Laws at 2107--09 (codified at 63 O.S.Supp.2005, §§ 1-1944 to 1-1948); see also John Greiner, Henry-Backed Issues Sail Through Senate, Oklahoman, Mar. 4, 2005, at 8A, available at https://www.oklahoman.com/ story/news/2005/03/04/henry-backed-issues-sail-through-senate/61952515007/.

available at https://former.okhouse.gov/Media/ News_Story.aspx?NewsID=453.

See H.B. 2381, § 1, 50th Leg., 2d Reg. Sess. (Okla. 2006) (House committee substitute) (removing what had been subsection D in the introduced version of H.B. 2381); Okla. State Leg., Bill Information for H.B. 2381, http:// www.oklegislature.gov/BillInfo.aspx?Bill=HB2381&Session=0600 (last visited Nov. 12, 2024).

supra note 76.

Id.

available at https://former.okhouse.gov/Media/News_Story.aspx? NewsID=358.

Compare H.B. 2569 (introduced), with H.B. 2569, 50th Leg., 2d Reg. Sess. (Okla. 2006) (committee substitute); Tracking Bills Move to House, Oklahoman, Mar. 1, 2006, at 6A, available at https://www.oklahoman.com/story/news/2006/03/01/ legislationbroutbreak-protection-plan-okd/61898643007/; Okla. State Leg., Bill Information for H.B. 2569, http://www.oklegislature.gov/BillInfo.aspx?Bill= HB2569&Session=0600 (last visited Nov. 12, 2024).

See infra ¶¶ 43--44; see also Starkey, 2013 OK 43

available at https://former.okhouse.gov/Media/ News_Story.aspx?NewsID=343.

Id. (emphasis added).

Id.; H.B. 2830, 50th Leg., 2d Reg. Sess. (Okla. 2006) (introduced).

Compare H.B. 2830 (introduced), with H.B. 2830, 50th Leg., 2d Reg. Sess. (Okla. 2006) (committee substitute).

http://www.oklegislature.gov/ BillInfo.aspx?Bill=HB2830&Session=0600 (last visited Nov. 12, 2024).

See Act of June 7, 2006, ch. 294, §§ 2--3, 2006 Okla. Sess. Laws 1580, 1590--91 (codified at 47 O.S.Supp.2006, §§ 6-105.3(E), 6-115(F)); see also infra ¶ 36 (discussing S.B. 1964).

Keeping Oklahoma Kids Safe, Oklahoman, Jan. 15, 2006, at 17A, available at https://www.oklahoman.com/story/news/2006/01/15/ keeping-oklahoma-kids-safe/61905993007/; Press Release, Okla. H.R., First Plank of House GOP "Keeping Oklahoma Kids Safe" Initiative Clears Committee (Feb. 7, 2006), available at https://former.okhouse.gov/Media/News_Story.aspx?NewsID =363.

supra note 89; Winchester, supra note 89, at 17A.

supra note 89, at 17A (emphasis added).

available at https://former.okhouse.gov/Media/News_Story.aspx? NewsID=337. Rep. Terrill's proposed amendment would arguably codify a recent Attorney General Opinion that concluded sex offender registration was not up for negotiation in plea deals. See Question Submitted by: The Honorable Virginia D. Sanders, McCurtain County District Attorney, 2003 OK AG 24

supra note 89; Press Release, Okla. H.R., Measure to Crack Down on Sex Offenders Clears Committee, Feb. 14, 2006, available at https://former.okhouse.gov/Media/News_Story.aspx?NewsID=411.

available at https://former.okhouse.gov/Media/News_Story.aspx? NewsID=672.

See infra ¶¶ 35--36 (discussing S.B. 1755 and S.B. 1964).

available at https://oksenate.gov/press-releases/senate-approves-bill-require-sex-offender-info-drivers-license.

supra note 97.

http://www.oklegislature.gov/ BillInfo.aspx?Bill=sb1426&Session=0600 (last visited Nov. 12, 2024).

See infra ¶ 45; Press Release, Okla. Senate, Senate Approves Bill to Require Sex Offender Info on Driver License (Mar. 5, 2007), available at https://oksenate.gov/press-releases/ senate-approves-bill-require-sex-offender-info-driver-license.

available at https://oksenate.gov/ press-releases/bill-provide-sex-offender-registry-health-commissioner-heads-governor?back=/press-releases/2006-05%3Fpage%3D3.

Registry Sought on Sex Offenders, Oklahoman, May 3, 2006, at 5A, available at https://www.oklahoman.com/story/news/2006/05/03/legislation-br-bill-meant-to-bolster-bail-laws/6188667 0007/.

http://www.oklegislature.gov/BillInfo.aspx?Bill=sb1707&Session=0600 (last visited Nov. 12, 2024); LEGISLATION: Henry Signs Bills, Oklahoman, May 10, 2006, at 9A, available at https://www.oklahoman.com/story/news/2006/05/10/ budget-br-energy-taxes-fuel-economy/61885455007/.

http://www.oklegislature.gov/ BillInfo.aspx?Bill=sb1708&Session=0600 (last visited Nov. 12, 2024).

supra note 105.

See supra notes 89--95 and accompanying text.

supra note 105; Jennifer Mock, Sex Offenders Bill Aims to Increase Punishment, Oklahoman, Apr. 12, 2006, at 3A, available at https://www.oklahoman.com/story/news/2006/04/12/sex-offender-bill-aims-to-increase-punishment/61891011007/.

supra note 105.

See infra ¶¶ 35--36.

available at https://oksenate.gov/press-releases/house-rejects-death-penalty-child-molesters?back=/press-releases/2006-04; Okla. State Leg., Bill Information for S.B. 1747, http://www.oklegislature.gov/BillInfo.aspx?Bill=sb1747 &Session=0600 (last visited Nov. 12, 2024).

supra note 112.

Id.; Jennifer Mock, Bill Seeks Death Option for Sex Offenders, Oklahoman, Apr. 16, 2006, at 8A, available at https://www.oklahoman.com/story/news/2006/04/16/ bill-seeks-death-option-for-sex-offenders/61890034007/; see supra notes 104--110 and accompanying text (discussing S.B. 1708).

available at https://oksenate.gov/press-releases/senator-nichols-targets-child-predators-death-penalty-child-abuse-response-team?back=/press-releases/2006-05. See generally Act of June 9, 2006, ch. 326, § 1, 2006 Okla. Sess. Laws 1792, 1794 (codified at 10 O.S.Supp.2007, § 7115 (renumbered 2009 as 21 O.S. § 843.5)).

Sex Offender Info May Be Required, Oklahoman, Feb. 15, 2006, at 4A, available at https://www.oklahoman.com/story/news/2006/02/15/legislation-br-committee-oks-measure-for-tax-relief/61900902007/.

http://www.oklegislature.gov/ BillInfo.aspx?Bill=sb1754&Session=0600 (last visited Nov. 12, 2024).

See supra ¶ 32.

See supra notes 92-93 and accompanying text (discussing Rep. Terrill's amendment to H.B. 2839).

See supra note 90 and accompanying text (discussing Rep. Winchester's H.B. 2839).

LEGISLATION: Sex Offender Bill Passes House, Oklahoman, Apr. 21, 2006, at 6A, available at https:// www.oklahoman.com/story/news/2006/04/21/legislation-br-sex-offender-bill-passes-house/61889152007/.

http://www.oklegislature.gov/ BillInfo.aspx?Bill=sb1755&Session=0600 (last visited Nov. 12, 2024).

see also Press Release, Okla. Senate, Bill to Reform Sex Offender Registry Passes Senate (May 26, 2006), available at https://oksenate.gov/press-releases/bill-reform-sex-offender-registry-passes-senate?back=/press-releases/2006-05; Michael McNutt, Governor Signs 54 Bills into Law, Oklahoman, June 8, 2006, at 5A, available at https:// www.oklahoman.com/story/news/2006/06/08/governor-signs-54-bills-into-law/618 78835007/.

Id., 2006 Okla. Sess. Laws at 1476.

See supra ¶¶ 32, 35.

available at https://former.okhouse.gov/Media/News_Story.aspx?NewsID= 724; Jennifer Mock, House Amends, Passes Sex Offender Legislation, Oklahoman, Apr. 25, 2006, at 3A, available at https://www.oklahoman.com/story/news/2006/04/ 25/house-amends-passes-sex-offender-legislation/61888399007/.

See supra notes 92-93 and accompanying text (discussing Rep. Terrill's amendment to H.B. 2839).

See supra notes 85 and accompanying text (discussing Rep. Billy's H.B. 2830).

See supra note 90 and accompanying text for a discussion of Rep. Winchester's H.B. 2839.

See supra note 80 and accompanying text (discussing Rep. Kiesel's H.B. 2569).

http://www.oklegislature.gov/ BillInfo.aspx?Bill=sb1964&Session=0600 (last visited Nov. 12, 2024).

Id., 2006 Okla. Sess. Laws at 1580--81.

See Jay F. Marks, Courts: Lawsuit Questions Legality of Housing Restriction, Oklahoman, Feb. 4, 2006, at 1A, available at https://www.oklahoman.com/story/ news/2006/02/04/courts-lawsuit-questions-legality-of-housing-restrictionbrman-challenges-sex-offender-law/61902731007/; Jay F. Marks, Offender Drops Challenge to Law, Oklahoman, Feb. 16, 2006, at 5A, available at https:// www.oklahoman.com/story/news/2006/02/16/offender-drops-challenge-to-law/619 00740007/; Settlement Agreement & Stip. by the Parties ¶¶ 3--4, at 2, Doe v. Lane, No. 5:06-cv-00074-HE (W.D. Okla. Feb. 13, 2006); David Harper, Sex Offenders Challenge Laws Concerning Where They May Live, Tulsa World, Sept. 2, 2006, at 1, available at https://tulsaworld.com/archive/sex-offenders-challenge-laws-concerning-where-they-may-live/article_16ea0a76-ae30-5d41-a094-92dc188efbd4. html; David Harper, Sex Offenders Drop Lawsuit, Tulsa World, Feb. 16, 2008, at 11, available at https://tulsaworld.com/archive/sex-offenders-drop-lawsuit/article_5eed 6ddf-d875-52d9-bc9a-2d824e329676.html; Press Release, ACLU of Okla., Sex Offender Residency and Travel Restriction Case Dismissed (June 26, 2008), available at https://www.acluok.org/en/press-releases/sex-offender-residency-and-travel-restriction-case-dismissed; Jt. Stip. of Dismissal Without Prejudice 1, Doe v. Parish, No. 4:06-cv-00457-GKF-FHM (N.D. Okla. Feb. 13, 2008) (disclosing settlement but not detailing the terms).

supra note 139.

available at https://former.okhouse.gov/ Media/News_Story.aspx?NewsID=1114.

Id.

Id.; H.B. 1816, 51st Leg., 1st Reg. Sess. (Okla. 2007) (introduced).

supra note 145; H.B. 1051, 51st Leg., 1st Reg. Sess. (Okla. 2007) (introduced); see also supra ¶ 69.

See Okla. State Leg., Bill Information for H.B. 1816, http:// www.oklegislature.gov/BillInfo.aspx?Bill=hb1816&Session=0700 (last visited Nov. 12, 2024); Act of June 4, 2007, ch. 325, §§ 1--3, 2007 Okla. Sess. Laws 1381, 1381--85 (codified at 10 O.S.Supp.2007, § 7115(F), (I) (renumbered 2009 as 21 O.S. § 843.5)); 21 O.S.Supp.2007, §§ 1021(B)(2), 1123(A)(5)); Okla. State Leg., Bill Information for H.B. 1051, http://www.oklegislature.gov/BillInfo.aspx? Bill=hb1051&Session=0700 (last visited Nov. 12, 2024); Act of May 31, 2007, ch. 164, § 1, 2007 Okla. Sess. Laws 841, 842--43 (codified at 70 O.S.Supp.2007, § 24-100.6). H.B. 1051 did have additional provisions tacked onto it regarding the Diabetes Management in Schools Act, 70 O.S.Supp.2007, §§ 1210.196.2--1210.196.8; but the sex offender provision was unaltered.

Compare id., with H.B. 1381, 51st Leg., 1st Reg. Sess. (Okla. 2007) (committee substitute); Okla. State Leg., Bill Information for H.B. 1381, http:// www.oklegislature.gov/BillInfo.aspx?Bill=HB1381&Session=0700 (last visited Nov. 12, 2024).

supra note 147.

http:// www.oklegislature.gov/BillInfo.aspx?Bill=HB1529&Session=0700 (last visited Nov. 12, 2024).

http:// www.oklegislature.gov/BillInfo.aspx?Bill=HB1714&Session=0700 (last visited Nov. 12, 2024).

Id.

Id.; Act of May 31, 2007, ch. 182, § 1, 2007 Okla. Sess. Laws 900, 907 (codified at 22 O.S.Supp.2007, § 991a(A)(14)--(15)).

http:// www.oklegislature.gov/BillInfo.aspx?Bill=HB1993&Session=0700 (last visited Nov. 12, 2024).

available at https://former.okhouse.gov/Media/News_Story.aspx?NewsID=991.

http:// www.oklegislature.gov/BillInfo.aspx?Bill=HB1825&Session=0700 (last visited Nov. 12, 2024).

Compare H.B. 1825, §§ 1--7 (introduced), with H.B. 1760, §§ 23--29, 51st Leg., 1st Reg. Sess. (Okla. 2007) (introduced); see also Jennifer Mock & Bryan Dean, Tiered System Viewed for Sex Offender Law, Oklahoman, Apr. 22, 2007, at 6A, available at https://www.oklahoman.com/story/ news/2007/04/22/tiered-system-viewed-for-sex-offender-law/61788478007/.

Compare H.B. 1825, § 5 (introduced) (to be codified at 57 O.S.Supp.2007, § 582.3); H.B. 1760, § 25 (introduced) (to be codified at 57 O.S.Supp.2007, § 582.3); with Act of June 4, 2007, ch. 261, §§ 24--25, 2007 Okla. Sess. Laws 1173, 1199 (missing the provision that would have been codified at 57 O.S.Supp.2007, § 582.3).

see also supra note 159 and accompanying text.

See supra notes 139--140 and accompanying text. More specifically, in the enacted provisions of the bill, the Legislature clarified that the existing residency restrictions only applied to parks if they had been "zoned by city, county, state, federal or tribal government" and to day care facilities if they were a "licensed child care center as defined by the Department of Human Services." ch. 261, § 29, 2007 Okla. Sess. Laws at 1208 (codified at 57 O.S.Supp.2007, § 590(A)). They also clarified that the "[e]stablishment of a day care center or park in the vicinity of a residence of a registered sex offender will not require the relocation of the sex offender or the sale of the property" and that the residency restrictions would "not apply to any registered sex offender residing in a hospital or other facility . . . [that] provide[s] medical services." Id., § 29, 2007 Okla. Sess. Laws at 1208--09 (codified at 57 O.S.Supp.2007, § 590(A), (C)). Similar clarifications were made regarding zones of safety, and the Legislature also clarified that "[n]othing in this section shall prohibit" a registered sex offender "from attending a recognized church or religious denomination for worship; provided the person has notified the religious leader of his or her status . . . and the person has been granted written permission by the religious leader." Id. § 20, 2007 Okla. Sess. Laws at 1188--89 (codified at 21 O.S.Supp.2007, § 1125(A), (D)--(E)).

http://www.oklegislature.gov/BillInfo.aspx? Bill=HB1760&Session=0700 (last visited Nov. 12, 2024).

Id., 2007 Okla. Sess. Laws at 1173--74.

Id., 2007 Okla. Sess. Laws at 1424.

see also supra note 122 and accompanying text (discussing the exception that was enacted in 2006 as part of H.B. 1755).

http:// www.oklegislature.gov/BillInfo.aspx?Bill=SB109&Session=0700 (last visited Nov. 12, 2024); Act of Apr. 18, 2007, ch. 32, § 1, 2007 Okla. Sess. Laws 260, 260--61 (codified at 21 O.S.Supp.2007, § 1125).

Id., 2007 Okla. Sess. Laws at 260.

http:// www.oklegislature.gov/BillInfo.aspx?Bill=SB490&Session=0700 (last visited Nov. 12, 2024); S.B. 490, 51st Leg., 1st Reg. Sess. (Okla. 2007) (Senate floor).

supra note 177.

http:// www.oklegislature.gov/BillInfo.aspx?Bill=SB%20431&Session=0700 (last visited Nov. 12, 2024).

http:// www.oklegislature.gov/BillInfo.aspx?Bill=SB680&Session=0700 (last visited Nov. 12, 2024).

http:// www.oklegislature.gov/BillInfo.aspx?Bill=SB877&Session=0700 (last visited Nov. 12, 2024).

http:// www.oklegislature.gov/BillInfo.aspx?Bill=SB891&Session=0700 (last visited Nov. 12, 2024).

Id. § 590(B).

See supra note 31 and accompanying text (emphasis added) (quoting 57 O.S.Supp.1997, § 581(B)).

See supra notes 31--33 and accompanying text.

See supra notes 35--40 and accompanying text.

See supra notes 48--65 and accompanying text.

See supra notes 61, 65 and accompanying text.

See supra notes 121--122, 124 and accompanying text.

Id.

See supra notes 120, 122, 124--125 and accompanying text.

See supra note 115 and accompanying text.

See supra notes 132, 137 and accompanying text.

See supra notes 102--103 and accompanying text.

See supra notes 68--70 and accompanying text.

See supra notes 170--171 and accompanying text.

See supra notes 161--168 and accompanying text.

See supra note 101 and accompanying text.

See supra note 84 and accompanying text.

See supra note 115 and accompanying text.

See supra note 91 and accompanying text.

See supra note 92 and accompanying text.

See supra notes 139--140, 164 and accompanying text.

Id. ¶ 33. Essentially, they discredit the notion that SORA's residency restrictions are analogous to banishment as to Mr. Donaldson, because he isn't being kicked out of a house in which he already lives but is trying to live in a house he purchased after police told him he couldn't live there. As already stated, this constitutes an ad hominem attack against Mr. Donaldson. Although he may not be the most sympathetic registered sex offender in this regard (or other regards, for that matter), we shouldn't discount the argument wholesale. Other sex offenders have been and will be forced out of their homes because of newly amended residency restrictions. Newspaper articles from 2006 and 2007--i.e., when parks and playgrounds were added to the residency restrictions--are replete with references to sex offenders being forced out of their homes. Carrie Coppernoll et al., Sex Offenders Exiled: A New Law Is Forcing Many Registered Sex Offenders Out of Cities and into Rural Areas to Find Legal Housing, Oklahoman, Aug. 20, 2006, at 1A ("Even in small towns, there's often nowhere for sex offenders to live. In Gans, population of 200 or so near the Arkansas border, there isn't much housing period. There certainly wasn't any for Jack Gandy. Police Chief Sam Hill Jr. said he had no choice but to make sex offender Gandy move after the law passed in late May. . . . He felt harassed when the Gans police chief made him move."), available at https://www.oklahoman.com/story/news/2006/08/20/sex-offenders-exiled/61864913007/; Dawn Marks, Some Ex-Inmates May Have to Leave: Residence May Violate Sex Offender Law, Oklahoman, Sept. 24, 2005, at 6Norman ("A residence for former inmates may need to find a new location for some of its residents because they may be in violation of a law regulating the distance sex offenders can live from a school. Officials at the Oklahoma County District Attorney's office are preparing to notify the registered sex offenders living at Hand Up Ministries, 1142 N Broadway Drive, that they are living within 2,000 feet of the Oklahoma School of Science and Mathematics and have 30 days to move."), available at https://www.oklahoman.com/story/news/2005/09/24/ex-inmates-may-have-to-leavebrresidence-location-may-violate-sex-offender-law/61923557007/; Greg Elwell, Boundaries Tighten for Sex Offenders, Oklahoman, July 23, 2005, at 4East ("The growing number of day care centers and schools is forcing some sex offenders out of their homes, police said. . . . At least two sex offenders will be forced to move because of the updated information, [Detective Chris] Cook said."), available at https://www.oklahoman.com/story/news/2005/07/23/boundaries-tighten-for-sex-offendersbroptions-limited-by-day-care-schools/61933520007/.

See Majority Op. ¶ 65 (remanding the case back to the trial court for a first-instance determination of the factual issue of "whether Lake El Reno is a 'park' for purposes of 57 O.S.Supp.2019, § 590(A)").

See, e.g., Carrie Coppernoll et al., supra note 212, at 1A ("While officials figure out how to enforce the law, sex offenders still must find a legal place to live. Few urban areas are an option. In Tulsa, only 8 percent of the city's land lies outside 2,000-foot halos, police Sgt. John Adams said. And that 8 percent includes industrial zones. In Oklahoma City, only 16 percent of addresses are outside the halos. Offenders in other cities, such as Lawton and Enid, also are having trouble finding places to live. . . . Wayne, who spoke on condition that his full name not be revealed, . . . spent weeks looking for a house, apartment, anything that would meet the state's requirements. He started in Norman but quickly found nothing was available in the city. He asked law enforcement for help but was given none. He said Norman police told him the law was meant to keep him out of town, so he would have to turn in a list of potential homes, which police then would check for compliance."); Greg Elwell, Map Expands Edmond Areas Off-Limits to Sex Offenders, Oklahoman, Oct. 13, 2006, at 1A ("A new map released Thursday by Edmond police shows the areas where registered sex offenders are banned from living has more than doubled. . . . Neighborhoods seeking to keep sex offenders from moving in can build parks and playgrounds to extend the restricted area boundaries, [Detective Chris Cook] said."), available at https://www.oklahoman.com/story/news/crime/2006/10/13/map-expands-edmond-areas-off-limits-to-sex-offenders/61852945007/; Penny Owen, State's Sex Offenders Find It Tougher to Hide, Oklahoman, Aug. 4, 2002, at 15-A (describing a sex offender in Ardmore who only had to deal with disclosure provisions in SORA, not its residency restrictions that were yet to be enacted: "Whatever the residents of Wildewood Addition legally can do to 'embarrass this guy out of town,' they will do. . . . Ardmore resident and parent Christi Hawkins has a bigger goal than running Barry Eugene Farmer out of her neighborhood. She wants sex offenders to know they are not welcome in Ardmore, period. 'We don't want Ardmore to become the safe nesting ground for you,' Hawkins said at Tuesday's meeting. 'It's not just about this one guy.'"), available at https:// www.oklahoman.com/story/news/2002/08/04/states-sex-offenders-find-it-tougher-to-hide/62085409007/.

See Mock & Dean, supra note 159, at 6A ("Lawmakers are working this year to . . . put[] in place a tiered system that would evaluate each case individually to determine the level of risk a sex offender poses to the community. The change would allow law enforcement to focus their efforts and resources on those who are the biggest threat, supporters say. 'The key component is supervision,' said Rep. Gus Blackwell, R-Goodwell. 'When you hear the word "sex offender," you immediately think of a child rapist. There are so many other people caught within that; this makes the system more fair.' It also may mean only the tightest living restrictions would be applied to the sex offenders who remain a risk. . . . Details of the legislation are being worked out in the Legislature. The proposal would set up a risk assessment review committee at the Corrections Department. The committee would look at each case before a sex offender's release from prison and give each person a risk level ranking. That ranking would be tied to how long offenders must register and eventually could determine where they can live."). Alas, the Legislature ultimately only used the risk levels to assign different lengths of time for registration, with 15 years of registration for level 1 offenders, 25 years of registration for level 2 offenders, and life registration for level 3 offenders. Act of June 4, 2007, ch. 261, §§ 26--27, 2007 Okla. Sess. Laws 1173, 1200--02 (codified at 57 O.S.Supp.2007, §§ 582.5, 583).

See Coppernoll et al., supra note 212, at 1A; Mock & Dean, supra note 159, at 6A.